**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 27 2004**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CITY OF ALBUQUERQUE,

    Plaintiff-Appellant,

v.

UNITED STATES DEPARTMENT
OF THE INTERIOR,

    Defendant-Appellee.

No. 02-2214

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CIV-01-1266 LH/WWD)**

---

Charles W. Kolberg (Robert M. White, City Attorney, with him on the briefs),
Assistant City Attorney, Albuquerque, New Mexico, for Plaintiff-Appellant.

Hugo Teufel III (David C. Iglesias, United States Attorney, and Raymond
Hamilton, Assistant United States Attorney, Albuquerque, New Mexico; and
James Weiner, Department of the Interior, Washington, D.C., with him on the
brief), Associate Solicitor, Department of the Interior, Washington, D.C., for
Defendant-Appellee.

---

Before **SEYMOUR,** Circuit Judge, and **ANDERSON** and **BRORBY**, Senior
Circuit Judges.

---

**BRORBY**, Circuit Judge.

## BACKGROUND

The City of Albuquerque ("the City") appeals the district court's order granting defendant the United States Department of the Interior's ("Interior") motion to dismiss. The district court dismissed the complaint under Federal Rule of Civil Procedure 12(b)(1), determining it lacked subject matter jurisdiction to hear the City's case challenging Interior's procedures used in selecting a site for new office space in Albuquerque, New Mexico. *City of Albuquerque v. United States Dep't of the Interior*, 217 F. Supp. 2d 1194, 1197 (D. N.M. 2002). We disagree. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we reverse and remand for further proceedings consistent with this opinion.

The heart of this dispute is a 2001 Solicitation for Offers issued by Interior for the provision of office space to house the Office of the Special Trustee for American Indians. According to the City's complaint, throughout the site selection process the City contacted Interior and recommended property within Albuquerque's central business area. Notwithstanding the City's encouragement, Interior ultimately selected a location outside Albuquerque's central business area.

Upon learning of Interior's selected site, the City filed a complaint in the

United States District Court for the District of New Mexico. The complaint "challenges the procedures [Interior] used in reaching a final agency decision with respect to the site selection." Specifically, the City alleges Interior's selection process violated Executive Order 12,072 and its accompanying regulations. *See* Exec. Order No. 12,072, 43 Fed. Reg. 36,869 (Aug. 16, 1978); 41 C.F.R. § 101-17.001 to 17.049 (2000).

Executive Order 12,072 provides "[e]xcept where such selection is otherwise prohibited, the process for meeting Federal space needs in urban areas shall give first consideration to centralized community business area and adjacent areas of similar character, including other specific areas which may be recommended by local officials." Exec. Order No. 12,072 § 1-103. Similarly, the associated regulations instruct "[i]n meeting space needs in urban areas ... [f]irst consideration shall be given to a centralized business area and adjacent areas of similar character." 41 C.F.R. § 101-17.002(c)(1) (2000). The regulations further state "[s]pace needs shall be met outside the central business area only when one of [four] exceptions ... apply." *Id.* at §§ 101.17.002(c)(1), (m)(4).

The City alleges Interior violated the Executive Order and associated regulations through several actions during the selection process. First, the City

alleges Interior "disqualified the only offer that involved construction within the Central Business Area of the City of Albuquerque ... based on criteria not expressed in the Solicitation and not affecting the suitability of the site. [Interior] later announced that it was rescinding that disqualification." Second, the City alleges Interior "refused to consider available property recommended by local officials." Third, the City alleges the costs for a site within the centralized business area were comparable to the costs of the site Interior selected outside the area. Finally, the City criticizes Interior for "us[ing] a lack of open space as a basis for rejecting a site [within the centralized business area]" thereby giving "preference to suburban locations over [centralized business area locations]." In sum, the City believes Interior preferred a site outside the centralized business area and impermissibly manipulated the selection process to select that site.

In response to the City's complaint, Interior filed a motion to dismiss, arguing the district court lacked subject matter jurisdiction to hear the case. Interior asserted the City's complaint amounted to nothing more than a bid protest which, under the Administrative Dispute Resolution Act, must be brought in the United States Court of Federal Claims rather than federal district court. *See* 28 U.S.C. § 1491(b) note (2004) (Sunset Provision). Interior also argued the City lacks standing and was untimely in bringing the suit.

After allowing the City to respond to Interior's motion, the district court granted Interior's motion to dismiss, determining it did not have subject matter jurisdiction to adjudicate bid protests under either the Administrative Dispute Resolution Act or the Administrative Procedure Act. *Albuquerque*, 217 F. Supp. 2d at 1195-97. Because the district court concluded it had no jurisdiction to adjudicate the City's claim, it did not address Interior's standing and timeliness arguments. *See id*. at 1195 n.1.

**DISCUSSION**

On appeal, the City challenges the district court's dismissal of the City's claim for lack of subject matter jurisdiction. The City argues its cause of action challenging improper agency action was properly brought in federal district court under the Administrative Procedure Act.

In response, Interior urges us to affirm the district court's decision to dismiss the complaint because the court lacks subject matter jurisdiction. Interior further asserts the City's appeal must fail because the City has no standing under the Administrative Procedure Act. Lastly, Interior argues the City's action is moot.

For the reasons stated below, we agree with the City the district court erred in concluding it lacked subject matter jurisdiction in this case. We also conclude Interior's standing arguments and mootness arguments are unpersuasive. Therefore, we reverse and remand for further proceedings consistent with this opinion.

## A. Subject Matter Jurisdiction

We begin by examining whether the district court has subject matter jurisdiction. We review the district court's determination on this issue de novo. *U S West Inc. v. Tristani*, 182 F.3d 1202, 1206 (10th Cir. 1999), *cert. denied*, 528 U.S. 1106 (2000). Motions to dismiss for lack of subject matter jurisdiction "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based." *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002), *cert. denied*, 538 U.S. 999 (2003). Here, Interior's motion was a facial attack on the City's assertion of subject matter jurisdiction in the complaint. *See Albuquerque*, 217 F. Supp. 2d at 1195-96. "Accordingly, we presume all of the allegations contained in the ... complaint [are] true." *Ruiz*, 299 F.3d at 1180. With this standard in mind, we turn to the complaint's assertion of jurisdiction.

The City's complaint alleges the district court "has jurisdiction over this cause of action under [the Administrative Procedure Act,] 5 U.S.C. § 704, to review final agency action for which there is no other adequate remedy in a court." In this appeal, the City similarly argues "[t]he Administrative Procedure[] Act ... supplies district courts jurisdiction to hear alleged violations of [the Executive Order at issue here]."

The Supreme Court, however, has instructed us "the [Administrative Procedure Act] is not to be interpreted as an implied grant of subject-matter jurisdiction to review agency actions." *Califano v. Sanders*, 430 U.S. 99, 105 (1977). Because the Administrative Procedure Act does not confer subject matter jurisdiction, we must look elsewhere to determine whether subject matter jurisdiction exists in this case. *See Eagle-Picher Indus., Inc. v. United States*, 901 F.2d 1530, 1532 (10th Cir. 1990); *Alamo Navajo Sch. Bd., Inc. v. Andrus*, 664 F.2d 229, 232 (10th Cir. 1981).

We begin with the general federal question statute, 28 U.S.C. § 1331.[1] It

---

[1] In its jurisdictional statement, the City claims "[p]ursuant to 28 U.S.C. § 1357, the court below had jurisdiction to adjudicate the federal question presented by the City's request for review of the final action of a federal agency." We conclude § 1357 is not applicable in this case because it is limited to revenue

grants the district courts "original jurisdiction of all civil actions arising under the

Constitution, laws, or treaties of the United States." *Id.* While this grant of

authority is broad, § 1331 "does not waive the government's sovereign

immunity." *Eagle-Picher Indus.*, 901 F.2d at 1532. District court jurisdiction in

this case can be based on § 1331 only if there is some other statute waiving

sovereign immunity. *See New Mexico v. Regan*, 745 F.2d 1318, 1321 (10th Cir.

1984).

In search of a waiver of sovereign immunity, we return to the

Administrative Procedure Act. It "contains a limited waiver of the United States'

sovereign immunity." *Id.* The relevant section states:

> A person suffering legal wrong because of agency action ... is
> entitled to judicial review thereof. An action ... seeking relief other
> than money damages ... shall not be dismissed ... on the ground that it
> is against the United States.

5 U.S.C. § 702. This waiver is limited because it does not "confer[] authority to

grant relief if any other statute that grants consent to suit expressly or impliedly

cases and voting rights cases. *See id.* ("The district courts shall have original jurisdiction of any civil action commenced by any person to recover damages for any injury to his person or property on account of any act done by him, under any Act of Congress, for the protection or collection of any of the revenues, or to enforce the right of citizens of the United States to vote in any state.")

forbids the relief which is sought." *Id.* Consequently, we must read § 702 "in conjunction with other jurisdictional statutes waiving sovereign immunity." *Regan*, 745 F.2d at 1321-22.

According to Interior, the other waiver of sovereign immunity at issue in this case is the Tucker Act, as amended by the Administrative Dispute Resolution Act. *See* 28 U.S.C. § 1491. The Tucker Act waived the United States' sovereign immunity for some claims, provided the claims are brought in the United States Court of Federal Claims. *See* Tucker Act of March 3, 1887, ch. 359, 24 Stat. 505 (codified as amended at 28 U.S.C. § 1491); *United States v. Mitchell*, 463 U.S. 206, 213-14 (1983). In 1996, the Administrative Dispute Resolution Act amended the Tucker Act giving federal district courts and the Court of Federal Claims subject matter jurisdiction to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract." Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat. 3870, at 3874-75 (codified at 28 U.S.C. § 1491(b)). However, the Act contained a sunset provision stating "[t]he jurisdiction of the district courts of the United States over the actions described in § 1491(b)(1) of title 28, United States Code ... shall terminate on January 1, 2001." *Id*. (codified at 28 U.S.C. § 1491(b) note (2004) (Sunset Provision)). Congress did not act, and the

-9-

sunset provision has since taken effect. *See id.*

The thrust of Interior's argument is "[i]n granting express, concurrent protest jurisdiction to the district courts, the [Administrative Dispute Resolution Act] also took away the historical basis for district court protest jurisdiction under [*Scanwell Laboratories, Inc. v. Shaffer*], 424 F.2d 859 (D.C. Cir. 1970)." "Thus," Interior argues, "when the district courts lost bid protest jurisdiction under [the sunset provision], they also lost the ability to independently review such actions under the [Administrative Procedure Act]." In evaluating Interior's position, we will examine not only the language of the Administrative Dispute Resolution Act, but also the historical context in which Congress enacted it.

In the early twentieth century, parties upset with the federal government's contract procurement process or award of a contract had no judicial recourse. In *Perkins v. Lukens Steel Co.*, 310 U.S. 113 (1940), the Supreme Court held a disappointed bidder did not have standing to challenge the government's bid solicitation process. *See id.* at 126, 132. The Supreme Court opined the laws governing the government's solicitation of bids were meant to protect the government rather than potential sellers. *See id.* at 126. Consequently, the disappointed bidder in *Lukens Steel* had not acquired a legal right to any

-10-

particular government action.  *See id.*

*Lukens Steel's* holding prevailed until 1970 when the District of Columbia Circuit employed the Administrative Procedure Act to justify departing from *Lukens Steel*.  *See Scanwell Labs.*, 242 F.2d at 866.  In its seminal *Scanwell* case, the District of Columbia Circuit noted *Lukens Steel* was decided "during the heyday of the legal right doctrine, and before the passage of the Administrative Procedure Act."  *Id.*  The Administrative Procedure Act, according to *Scanwell,* departed from the *Lukens Steel* reasoning and instead embraced "the basic presumption of judicial review to one suffering legal wrong because of agency action."  *Id.* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 140-41 (1967) (quotation marks omitted)).  The opinion found "no evidence" Congress intended to preclude judicial review in government contracting disputes.  *Id*.  "If anything," the *Scanwell* court opined "the legislative intent with respect to the field of government contracting in general seems to ... favor [judicial] review."  *Id*.  On this basis, *Scanwell* held "one who has a prospective beneficial relationship has standing to challenge the illegal grant of a contract to another."  *Id.* at 870.  Other circuits, including the Tenth Circuit, subsequently confirmed that disappointed bidders had standing to challenge the government's award of a contract.  *See, e.g., Integrity Mgmt. Int'l, Inc. v. Tombs & Sons, Inc.*, 836 F.2d 485, 489 & n.7 (10th

Cir. 1987). Although "[t]he vast majority of cases brought pursuant to *Scanwell* were brought by disappointed bidders," *American Federation of Government Employees Local 1482 v. United States*, 258 F.3d 1294, 1301 (Fed. Cir. 2001), *cert. denied*, 534 U.S. 1113 (2002), some cases allowed non-bidders to exercise standing under the Administrative Procedure Act. *See, e.g., Ballerina Pen Co. v. Kunzig*, 433 F.2d 1204 (D.C. Cir. 1970); *City of Reading, Pa. v. Austin*, 816 F. Supp. 351 (E.D. Pa. 1993).

While some parties were pursuing relief in federal district court, many disappointed bidders sought recourse in the Court of Federal Claims and its predecessor courts[2] under the Tucker Act. *See, e.g., United States v. John C. Grimberg Co.*, 702 F.2d 1362 (Fed. Cir. 1983) (en banc). The Tucker Act required the claim be based on an express or implied contract. *See Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1132 (Fed. Cir. 1998) (discussing the historical application of the implied contract theory in bid protest cases brought in the Court of Federal Claims). Because of this requirement, standing in the Court of Federal Claims was limited to bidders or potential bidders. *See id.* Another key

---

[2] Prior to 1992, the Court of Federal Claims was known as the United States Claims Court. *See* Federal Courts Administration Act of 1992, Pub. L. No. 102-572, § 902(a), 106 Stat. 4506, 4516. Throughout this opinion, for simplicity's sake we refer to that court by its current name.

difference between the district courts and the Court of Federal Claims in government procurement cases involved the standard of review. Unlike the district courts' review under the Administrative Procedure Act, the Court of Federal Claims' review was typically limited to monetary relief. *See Finley v. United States*, 31 Fed. Cl. 704, 708 (1994) (overruled by statute). In 1982, Congress gave the Court of Federal Claims jurisdiction to grant declaratory and injunctive relief in "pre-award cases" – cases brought before the government had awarded the contract. *See* Federal Courts Improvement Act of 1982, Pub. L. No. 97-164, § 133(a), 96 Stat. 25, 40; *John C. Grimberg Co.*, 702 F.2d at 1372. The Court of Federal Claims, however, still did not have authority to grant declaratory relief in "post-award cases" – cases brought after the government had awarded the contract. *See John C. Grimberg Co.*, 702 F.2d at 1374.

With this history as backdrop, Congress enacted the Administrative Dispute Resolution Act. *See* Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat. 3870, at 3874-75 (codified at 28 U.S.C. § 1491). As previously mentioned, this Act gave the Court of Federal Claims subject matter jurisdiction to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or

regulation in connection with a procurement or a proposed procurement." *Id.* (codified at 28 U.S.C. § 1491(b)). The Act, however, provided "[t]he jurisdiction of the district courts of the United States over the actions described in § 1491(b)(1) of title 28, United States Code ... shall terminate on January 1, 2001." *Id.* (codified at 28 U.S.C. § 1491(b) note (2004) (Sunset Provision)). Congress did not act, and the sunset provision has since taken effect. *Id.*

Because the Administrative Dispute Resolution Act did not specifically mention the *Scanwell* case in either the text of § 1491(b) or the sunset provision, the Act's affect on the district courts' jurisdiction over cases brought by disappointed bidders is not immediately evident. The Federal Circuit has opined "the Court of Federal Claims is the only judicial forum to bring any governmental contract procurement protest." *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1080 (Fed. Cir. 2001).[3] On the other hand, at least one court has, since the passage of the Administrative Dispute Resolution Act, allowed a disappointed bidder to bring suit in the district court based on the Administrative

---

[3] *See also Novell, Inc. v. United States*, 109 F. Supp. 2d 22, 24 (D. D.C. 2000) ("[T]here no longer is ... an independent, [Administrative Procedure Act]-based jurisdiction for the district courts in government bid protest cases; rather, Congress effectively subsumed [Administrative Procedure Act] jurisdiction of the district courts into the more specific jurisdictional language of [the Administrative Dispute Resolution Act].").

Procedure Act's waiver of sovereign immunity as explained in *Scanwell*. *See Iceland S.S. Co.-Eimskip v. United States Dep't of the Army*, 201 F.3d 451, 453 (D.C. Cir.) ("Disappointed bidders may challenge a government contract award under the Administrative Procedure Act." (citing 5 U.S.C. § 706(2)(A) and *Scanwell*, 424 F.2d at 874)), *cert. denied*, 529 U.S. 1112 (2000).[4]

However, we need not determine today whether district courts retain jurisdiction over bid protests brought by disappointed bidders under *Scanwell* and the Administrative Procedure Act, because the case before us is not brought by a disappointed bidder or potential bidder. Instead, we focus on the portion of 28 U.S.C. § 1491(b) granting jurisdiction under that section only if suit is brought by "an interested party." The Federal Circuit has held "interested party" refers only to an "actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Local 1482*, 258 F.3d at 1302 (quotation marks and citation omitted). If the Federal Circuit is correct, it seems the Tucker Act as amended by the

_____

[4] *Iceland Steamship* did not mention 28 U.S.C. § 1491 or the Administrative Dispute Resolution Act. *See Icelamd S.S.*, 201 F.3d at 453. For a complete argument that the district courts retain jurisdiction over cases brought by disappointed bidders see Peter Verchinski, Note, *Are District Courts Still a Viable Forum for Bid Protests?*, 32 Pub. Cont. L. J. 393 (2003) (arguing the district court should remain a viable forum for bid protestors).

Administrative Dispute Resolution Act has little to say about cases brought by a party who is not an actual or prospective bidder.

In deciding § 1491(b) only applies to actual or prospective bidders, the Federal Circuit noted the text of the Administrative Dispute Resolution Act did not explicitly state whether the Act "intended to expand the class of parties who can bring bid protest actions in the Court of Federal Claims." *Local 1482*, 258 F.3d at 1300. As previously explained, prior to the Administrative Dispute Resolution Act, the Court of Federal Claims only heard cases brought by disappointed bidders or prospective bidders because the court's jurisdiction was based on an express or implied contract with the United States. In contrast, the district courts heard claims from a wider variety of plaintiffs. Citing three primary reasons, the Federal Circuit decided the Administrative Dispute Resolution Act only waived sovereign immunity for suits brought by actual or potential bidders. First, the Federal Circuit stated waivers of sovereign immunity should be narrowly construed. *See id.* at 1301; *Hull ex. rel. Hull v. United States*, 971 F.2d 1499, 1509 (10th Cir. 1992). Second, although the Administrative Dispute Resolution Act specifically stated the Administrative Procedure Act's standard of review should apply, it did not state the Administrative Procedure Act's standing requirements should apply. *See Local 1482*, 258 F.3d at 1302.

Additionally, instead of using the expansive standing language in the Administrative Procedure Act, the Administrative Dispute Resolution Act used the more narrow term "interested party." *See id.* Third, while legislative history for the Administrative Dispute Resolution Act in places mentions a desire to give the Court of Federal Claims "*Scanwell* jurisdiction," the vast majority of district court cases applying *Scanwell's* reasoning involved disappointed bidders. *See id.* at 1301. Further, other portions of the legislative history stated the Act would allow "'a *contractor* [to] challenge a Federal contract award.'" *Id.* at 1301-02 (quoting 142 Cong. Rec. S11848 (daily ed. Sept. 30, 1996) (statement of Sen. Cohen) (emphasis in original)). Based on this history, the Federal Circuit concluded Congress only intended § 1491(b) to apply to suits brought by actual or prospective bidders.

Because of the Federal Circuit's "exclusive role in [cases brought under 28 U.S.C. § 1491(b)], it makes sense for us to adopt that circuit's interpretation of the term 'interested party'" whether or not we would have adopted that interpretation in the first instance. *See Baltimore Gas & Elec. Co. v. United States*, 290 F.3d 734, 737-38 (4th Cir. 2002) (deciding the Administrative Dispute Resolution Act only waives the United States' sovereign immunity for suits brought by an actual or prospective bidder in a case brought prior to the sunset

-17-

provision's effective date). Therefore, we conclude the Administrative Dispute Resolution Act only waives sovereign immunity for a suit in the Federal Court of Claims when the suit is brought by an actual or prospective bidder. Because the City in this case is not an actual or prospective bidder, its case does not fall within the ambit of the Administrative Dispute Resolution Act or the subject matter jurisdiction of the Court of Federal Claims.

We take the Federal Circuit's reasoning one step further and conclude the Federal Dispute Resolution Act did not affect the district courts' jurisdiction to hear cases that are not brought by an actual or potential bidder. Prior to the Act, the district court heard cases brought by non-bidders under 28 U.S.C. § 1331 and the waiver of sovereign immunity in the Administrative Procedure Act. The Administrative Dispute Resolution Act does not directly address these types of cases. Section 1491(b) itself only addresses cases brought by an "interested party," which we have explained means only an actual or prospective bidder. Likewise, the sunset provision only affects "actions described in section 1481(b)(1) of title 28" namely cases brought by actual or prospective bidders. *See* 28 U.S.C. § 1491(b) note (Sunset Provision). Thus, nothing on the face of the statute suggests it was meant to apply to or affect cases not brought by an "interested party."

Furthermore, the legislative history of the Administrative Dispute Resolution Act does not lead to the conclusion Congress intended to leave parties who were not actual or prospective bidders without a remedy. Interior has not provided, nor have we found, any piece of legislative history suggesting parties who had some avenue available to seek redress before the passage of the Administrative Dispute Resolution Act would be left without an avenue for relief after the Act became effective. In fact, the only portions of the legislative history that arguably address non-bidders refer only generally to "*Scanwell* jurisdiction." *See Local 1482*, 258 F.3d at 1301. While it may have been possible to read these portions of the history as evidence Congress intended to eliminate all district court jurisdiction except for the jurisdiction explicitly granted in the Administrative Dispute Resolution Act, this reading would be inconsistent with the reading the Federal Circuit employed in determining "interested party" refers only to disappointed bidders or prospective bidders. The Federal Circuit concluded the legislative history's references to "*Scanwell* jurisdiction" most likely referred only to the majority of *Scanwell*-based cases that involved disappointed bidders or prospective bidders. We choose to adopt the Federal Circuit's reasoning.

In sum, we conclude the Administrative Dispute Resolution Act did not

affect the district court's ability to hear cases challenging the government's contract procurement process so long as the case is brought by someone other than an actual or potential bidder.[5]  The district court retains subject matter jurisdiction over cases brought by non-bidders under 28 U.S.C. § 1331 and the waiver of sovereign immunity in the Administrative Procedure Act.  Thus, the district court has jurisdiction over the subject matter of the City's complaint.

## B.  Standing

We next turn to Interior's argument that the City lacks standing to bring this case.  Although the district court did not address the question of the City's standing, *see Albuquerque*, 217 F. Supp. 2d at 1195 n.1, standing is a "threshold issue" we can address "regardless of whether the district court expressly addressed [it]."  *Bd. of County Comm'rs of Sweetwater County v. Geringer*, 297 F.3d 1108, 1111 (10th Cir. 2002) (quotation marks and citation omitted).  "The standing inquiry requires us to consider both constitutional limits on federal-court jurisdiction and prudential limitations on its exercise."  *Id*. (quotation marks and citations omitted).

---

[5]  We again emphasize this opinion expresses no view as to whether a bidder may bring a contract procurement-type suit in district court under *Scanwell* and the Administrative Procedure Act.

## 1. Constitutional Standing

We look first to the constitutional standing requirements. Constitutional standing has three elements. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "First, the plaintiff must have suffered an 'injury in fact'" – an injury both "concrete and particularized" and "actual or imminent." *Id.* (citations omitted). "Second, there must be a causal connection between the injury and the conduct complained of." *Id.* "Third, it must be 'likely' ... the injury will be redressed by a favorable decision." *Id.* at 561 (quotation marks and citation omitted).

On appeal, Interior argues the City has not suffered "the requisite concrete, particularized harm for which the court can provide a remedy." To the extent the City's complaint alleges only harm caused by an inappropriate selection process rather than harm caused by Interior's failure to select a specific location, Interior argues the City's injury is only conjectural rather than concrete and particularized. The City argues this case is distinguishable from other cases brought by cities based on Executive Order 12,072, because in those cases the federal agency "moved existing offices within the [central business area] to suburbs outside of the city limits." *See City of Reading*, *Jane D. v. Social Security Admin.*, Civ. A. No. 87-1867, 1987 WL 25625 (E.D. La. Nov. 30, 1987) (unpublished decision).

In the case before us, Interior asserts it chose a site within the City, so, Interior reasons, the City's tax revenues will not be affected. To the extent the City alleges harm suffered because Interior failed to select the only offer within the central business area, Interior asserts the City cannot establish it has suffered any harm because, it alleges, other government offices have since occupied that site. Interior also argues "[t]he City cannot point to a single other site within the [central business area] that would have been suitable for Interior's needs" and asserts "no other known site exists." Thus, Interior urges us to conclude the City lacks standing to bring this case.

We conclude the City's complaint has alleged sufficient facts to establish constitutional standing. "At the pleading stage, general factual allegation of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Defenders of Wildlife*, 504 U.S. at 561 (quotation marks, alterations and citations omitted). Here, the City's complaint alleged that by locating its offices outside the central business area, Interior was "weakening the City of Albuquerque and discouraging development and redevelopment of the [central business area]." Although Interior argues this alleged injury is too conjectural, it is the type of injury Executive Order 12,072

-22-

contemplates. *See* Exec. Order. 12,072 § 1-101. The Executive Order provides "Federal facilities and Federal use of space in urban areas shall serve to strengthen the Nation's cities and to make them attractive places to live and work. Such Federal space shall conserve existing urban resources and encourage the development and redevelopment of cities." *Id.* In this type of case, the City's complaint need not allege economic injury or lost tax revenue – "standing may be predicated on noneconomic injury." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 486 (1982). Here the City has alleged a concrete interest in the development of its central business area and that it will be harmed should Interior locate its offices outside the central business area. This is sufficient to establish a constitutional "injury in fact" in a case brought under Executive Order 12,072. *See City of Reading*, 816 F. Supp. at 358 (noting that a plaintiff need not suffer economic injury to meet the constitutional standing requirements in cases brought under Executive Order 12,072).

We also reject Interior's suggestion the City lacks standing because once other federal agencies filled the one central business area location that offered space to Interior, any harm to the City disappeared. The City's alleged injury is not caused by Interior's failure to select *a specific site* in the central business area. Rather it is based on Interior's failure to select *any site* in the central

business area. Although Interior faults the City's complaint for not identifying other specific locations, the City's complaint did allege "[t]he Department of Interior despite extensive contact from the City of Albuquerque refused to consider available property recommended by local officials within the [central business area]." The natural inference from this allegation is that available property exists within the City of Albuquerque's central business area. Because the case is before us with only a complaint, we must presume that the allegations in the complaint are correct and the City will be able to prove specific facts to support the claim. *See Defenders of Wildlife*, 504 U.S. at 561. Consequently, we conclude Interior's argument that the City does not meet the constitutional standing requirements is without merit.

### 2. Prudential Standing

In addition to its constitutional standing arguments, Interior contends the City does not meet the prudential standing requirements because it "is not within the 'zone of interests' of a statute supporting standing under the [Administrative Procedure Act]." In making this argument, Interior asserts neither the executive order nor the Federal Property and Administrative Services Act of 1949 (which the Executive Order was based on) evidences congressional intent to provide non-bidders a private right of action under the executive order.

-24-

We agree Executive Order 12,072 does not specifically create a cause of action or mention judicial review. However, "under certain circumstances, Executive Orders ... are treated as agency action and reviewed under the Administrative Procedure Act." *City of Carmel-by-the-Sea v. United States Dep't of Transp.*, 123 F.3d 1142, 1166 (9th Cir. 1997). To be enforceable under the Administrative Procedure Act the executive order must meet three specific requirements. First, the executive order must have a "specific statutory foundation." *Id.* If an executive order has a specific statutory foundation it is given the effect of a congressional statute. *See Farkas v. Texas Instrument, Inc.*, 375 F.2d 629, 632 & n.1 (5th Cir. 1967); *Farmer v. Philadelphia Elec. Co.*, 329 F.2d 3, 7 (3d Cir. 1964). Second, neither the statutory foundation nor the executive order must preclude judicial review. *See* 5 U.S.C. § 701(a)(1). Third, there must be "law to apply" – that is, there must be an objective standard by which a court can judge the agency's actions. *See* 5 U.S.C. § 701(a)(2); *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). If the executive order meets these requirements it can be enforced through judicial action. *See City of Carmel-by-the-Sea*, 123 F.3d at 1166.

### a. Statutory Foundation

We begin with the requirement that the executive order be based on a

specific statutory foundation.  Executive Order 12,072 was issued under the "authority vested in [the] President of the United States of America by Section 205(a) of the Federal Property and Administrative Services Act of 1949, as amended (40 U.S.C. 486(a))."  This Act gave the President power to "prescribe such policies and directives, not inconsistent with the provisions of this Act, as he shall deem necessary to effectuate the provisions of said Act, which policies and directive shall govern the Administrator and executive agencies in carrying out their respective functions."  40 U.S.C. § 486(a) (2000).[6]  As a House of Representatives Report explains, "[b]y reason of the impact of this legislation upon all agencies in the executive establishment, this subsection authorizes the President, if he deems it advisable, to prescribe over-all policies and directives which shall govern the Administrator of General Services and executive agencies in operations under this act." H.R. Rep. No. 81-670 (1949), *reprinted in* 1949 U.S.C.C.A.N. 1475, 1491.

Interior suggests the Executive Order lacks sufficient statutory foundation

---

[6] This portion of the Act has recently been amended.  Its current version, located in 40 U.S.C. § 121 (2004), states:  "The President may prescribe policies and directives that the President considers necessary to carry out this subtitle." The change in wording was intended to conform the language of the statute to contemporary usage rather than to substantively change the law.  *See* H.R. Rep. No. 107-479 (2002), *reprinted in* 2002 U.S.C.C.A.N. 827, 827-28.

because there is nothing in the language of the Federal Property and Administrative Services Act of 1949 that indicates a congressional intention to create enforceable rights in non-bidders. Further, Interior suggests the statutory foundation is insufficient because the Act does not contain "any directive addressing location of federal office space within the [central business area]."

Our review of the Federal Property and Administrative Services Act of 1949 convinces us the Act provides a sufficient statutory foundation for Executive Order 12,072. It is well established that Congress may delegate responsibility to the executive branch so long as Congress provides an "intelligible principle" to guide the exercise of the power. *See J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928). Congress chose to utilize a relatively broad delegation of authority in the Federal Property and Administrative Services Act of 1949. However, Congress did instruct the President's exercise of authority should establish "an economical and efficient system for ... the procurement and supply" of property. *See* 40 U.S.C. § 471 (2000).[7] We think Executive Order 12,072's directions concerning the consideration of locations within the central business area are sufficiently related

---

[7] The current version is codified at 40 U.S.C. § 101 (2004).

to the Act to be a valid exercise of the Act's delegated authority.[8]  Thus,

Executive Order 12,072 must "be accorded the force and effect given to a statute

enacted by Congress."  *See Farkas*, 375 F.2d at 632.  Since we give the Executive

Order the force and effect of a statute, it can provide the basis for standing under

the Administrative Procedure Act.  It simply does not matter that the Federal

Property and Administrative Services Act of 1949 does not specifically mention

either central business areas or each party that has standing under the Act.


Interior suggests standing under the Administrative Procedure Act can only

be provided through a statute itself rather than an executive order.  In support of

its position, Interior cites several cases holding federal employees did not have

standing to sue under Office of Management and Budget Circular A-76.  *See, e.g.,*

*Courtney v. Smith*, 297 F.3d 455 (6th Cir. 2002), *cert. denied*, 124 S. Ct. 64

(2003); *United States Dep't of Health & Human Servs. v. Fed. Labor Relations*

*Auth.*, 844 F.2d 1087, 1096 (4th Cir. 1988).  We think Interior's reading of the

Administrative Procedure Act is too restrictive.  The Administrative Procedure

Act allows standing for "[a] person suffering legal wrong because of agency

action, or adversely affected or aggrieved by agency action within the meaning of

---

[8]  Indeed, Interior does not argue Executive Order 12,072 goes beyond the scope of authority Congress delegated.

a relevant statute." 5 U.S.C. § 702. Interior's position seems to ignore the portion of the Act granting standing to "[a] person suffering legal wrong because of agency action." *Id.* When this portion is read in conjunction with the rest of the Administrative Procedure Act, we think it clearly allows standing for those plaintiffs "within the 'zone of interests' protected by the statute, executive order, or regulation which the agency is alleged to have violated" provided, of course, that the executive order or regulation is within in the scope of authority delegated by Congress. *Buffalo Cent. Terminal v. United States*, 886 F. Supp. 1031, 1044 (W.D. N.Y. 1995). *See also H & F Enters., Ltd. v. United States,* 973 F. Supp. 170, 174 (D. D.C. 1996). Similarly, Interior's reliance on the cases involving Office of Management and Budget Circular A-76 is misplaced. The Circular explicitly instructed it should "not be construed to create any substantive or procedural basis for anyone to challenge any agency action or inaction." *See Courtney*, 297 F.3d at 462; *Fed. Labor Relations Auth.*, 844 F.2d at 1095.[9] If anything, these cases support our conclusion because they looked beyond the foundational statute in determining whether the plaintiffs had standing. *Cf. Lee v.*

---

[9] The Federal Labor Relations Authority case further explained: "A Presidential order may have the force and effect of law when it is issued pursuant to statutory mandate or a delegation from Congress of lawmaking authority ..., but Circular A-76 was issued pursuant to no such authority." *Fed. Labor Relations Auth.*, 844 F.2d at 1096. *But see Nat'l Fed'n of Fed. Employees v. Cheney,* 883 F.2d 1038, 1043 (D.C. Cir. 1989) (stating "although promulgated pursuant to congressional authority, the Circular itself cannot grant standing").

*United States Air Force*, 354 F.3d 1229, 1245-46 (10th Cir. 2004) (consulting an administrative regulation in determining whether plaintiff met the prudential zone of interests test). Consequently, we conclude the executive order has sufficient statutory authority and must be accorded the force of a congressional statute.

### b. Availability of Judicial Review

We next consider whether the Federal Property and Administrative Services Act of 1949 or Executive Order 12,072 preclude judicial review. Standing under the Administrative Procedure Act is not available if a statute precludes judicial review of the agency action. *See* 5 U.S.C. § 701(a)(1). In this case, neither the Act nor the Executive Order explicitly denies standing or a private right of action to any plaintiffs.

In Part A of this opinion, we discussed the evolution of judicial review of the government procurement process. As we explained, the Administrative Procedure Act opened the door by granting plaintiff standing to challenge the government procurement process. *See Scanwell Labs.*, 242 F.2d at 866. In *Scanwell*, the District of Columbia Circuit states there was "no evidence" Congress intended to preclude judicial review in government contracting disputes.

-30-

*Id.* "If anything, the legislative intent with respect to the field of government contracting in general seems to ... favor ... review." *Id.* We find nothing causing us to believe Congress intended to preclude review in cases like the one before us.

Interior argues it is "the City's burden to show that Executive Order 12,072 or any relevant statute 'suggests a congressional intent to permit the plaintiff's suit.'" This argument misses the mark. The Supreme Court has clearly stated that under a prudential "zone of interests" inquiry, "there need be no indication of congressional purpose to benefit the would-be plaintiff." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399-400 (1987). There is a presumption favoring review unless "the congressional intent to preclude judicial review is fairly discernable in the statutory scheme." *Id.* at 399 (quotation marks and citations omitted).

Here, Interior argues we should infer a congressional intent to preclude review from language in Executive Order 13,006. Executive Order 13,006 was issued pursuant to the President's authority under "the laws of the United States of America, including the National Historic Preservation Act (16 U.S.C. 470 et seq.) and the Public Buildings Cooperative Use Act of 1976 (90 Stat. 2505), and in furtherance of and consistent with Executive Order No. 12072." Unlike

-31-

Executive Order 12,072, Executive Order 13,006 specifically states it "is not intended to create, nor does it create, any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its agencies or instrumentalities, its officers or employees, or any other person." We do not think the fact one executive order specifically states it does not create a private right of action leads to the conclusion another executive order lacking a similar provision also does not create a private right of action. Rather the fact some executive orders explicitly provide they do not create a private right of action suggests other executive orders may create a right of action.

In short, Interior has not cited, nor have we found, any persuasive evidence indicating executive orders issued under the Federal Property and Administrative Services Act of 1949 are unenforceable.

### c. Law to Apply

Lastly, we consider whether there is any meaningful law to apply. Under the Administrative Procedure Act, judicial review is unavailable where "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). As the Supreme Court has explained, the scope of this provision is "narrow;" it is only applicable when there is "no law to apply" or where there is "no meaningful

standard against which to judge the agency's exercise of discretion." *Heckler*, 470 U.S. at 830. We have previously held "law to apply" can refer to administrative regulations as well as statutes. *See McAlpine v. United States*, 112 F.3d 1429, 1433 (10th Cir.), *cert. denied*, 522 U.S. 984 (1997). Likewise, the "law to apply" may be supplied by an executive order. *See City of Carmel-by-the-Sea*, 123 F.3d at 1166 (concluding there was law to apply when an executive order "set objective standards").

Interior argues "[t]he Executive Order and regulations provide[] no fixed standard." We disagree. The Executive Order provides that "[e]xcept where such selection is otherwise prohibited, the process for meeting Federal space needs in urban areas shall give first consideration to a centralized community business area and adjacent areas of similar character, including other specific areas which may be recommended by local officials." Exec. Order No. 12,072 § 1-103. The Order instructs the Administrator of General Services to "develop programs to implement the policies of this Order" and to "[i]ssue regulations, standards, and criteria for the selection, acquisition, and management of Federally owned and leased space." *Id*. at § 1-201(b). In following this directive, the Administrator issued a plethora of regulations. Among other things, the regulations in effect at the time of the procurement process in this case required:

In meeting space needs in urban areas

First consideration shall be given to a centralized business area and adjacent areas of similar character in the central city ..., including other specific areas of a city recommended by the elected chief executive officer of the local government or a designee, except where this type of consider is otherwise prohibited. Space needs will be met outside the central business area of a central city ... only when one of the following circumstances exist:

(i) The service area of an activity is limited to a clearly defined sector of a city or a suburban or rural community, as is the case with satellite or branch offices; or where onsite activities are involved, such as inspection and/or maintenance operations at border stations, airports, seaports, or other similar activities;

(ii) Immediate compliance is not possible due to existing leasing commitments in areas outside the central business area ... In these cases, plans for the future compliance shall be made; *i.e.*, the activity shall be relocated to the central business area upon expiration of the lease;

(iii) The proposed facility or the activity's use of a facility is not in compliance with local land use or zoning ordinances; or

(iv) The elected chief executive officer of the local government or a designee advises the agency that an activity or facility should be located in an area of the central city other than the [central business area].

41 C.F.R. § 101-17.002(c)(1) (2000). The regulations additionally require the agency collect a variety of data to be used in "reach[ing] a final decision on a proposed relocation into a central business area." 41 C.F.R. § 101-17.002(d)(4) (2000). We think it would be redundant to cite further from these lengthy

regulations. Suffice it to say, the portions quoted above illustrate the regulations' specific nature. We conclude the regulations are sufficiently specific to allow a court to determine whether Interior abused its discretion in its site selection process.[10]

Interior argues new regulations "have replaced and give even greater discretion to agencies than the regulations" in effect at the time of the procurement process at issue here. *See* General Services Administration Real Property Policies, 66 Fed. Reg. 5358 (Jan. 18, 2001); General Services Administration Real Property Policies Update, 67 Fed. Reg. 76820 (Dec. 13, 2002). Even assuming Interior's characterization of the "new" regulations is correct,[11] it is of little consequence in the case before us. We must consider this case "only on the basis of the regulations in effect at the times material." *Foster v. Udall*, 335 F.2d 828, 830 (10th Cir. 1964). To do otherwise would impermissibly give retroactive effect to the new regulations. *See Greene v. United States*, 376 U.S. 149, 160 (1964) (holding regulations affecting antecedent

---

[10] To the extent *Haltermann v. Johnson*, 988 F. Supp. 1477 (S.D. Ga. 1996), reached a different conclusion, we think it was decided incorrectly.

[11] Because the scope and effect of the current regulations are not before us, we make no attempt to ascertain the precise effect of these new regulations.

rights are not to be given retroactive effect absent an "unequivocal" manifestation the regulations were meant to be applied retroactively). The fact that current regulations might leave much to an agency's discretion does not mean prior regulations necessarily afforded the agency the same amount of discretion because an agency is free to change its method of meeting its statutory obligations. *See KVK P'ship v. Hotel*, 759 F.2d 814, 816 n.2 (10th Cir. 1985).[12] Consequently, we reaffirm our conclusion there is sufficient law for the court to apply in this case.

For the foregoing reasons, we think Executive Order 12,072 may be enforced under the Administrative Procedure Act. Having determined the Executive Order is enforceable in the courts, it is easy to conclude the City is within the zone of interests protected by the Executive Order. The Order itself explains: "Federal facilities and Federal use of space in urban areas shall serve to strengthen the Nation's cities and to make them attractive places to live and work. Such Federal space shall conserve existing urban resources and encourage the development and redevelopment of cities." Executive Order No. 12,072 § 1-101. The mandate of Executive Order 12,072 clearly encompasses the City's challenge

---

[12] Interior also urges us to affirm the district court's ruling on the basis the "uncontroverted record" shows Interior followed the new regulations. Suffice it to say the facts on this matter are not uncontroverted.

to Interior's selection process and the purported injury resulting therefrom.  As the City's complaint states, the removal of Interior offices from Albuquerque's central business area will injure the City "by weakening the City ... and discouraging development and redevelopment of the [central business area]."  Because this injury is exactly the type of injury President Carter hoped to address with Executive Order 12,072, we conclude the City has standing to challenge Interior's actions.  *See H & F Enters.*, 973 F. Supp. at 176; *City of Reading*, 816 F. Supp. at 358.


## C.  Mootness

Finally, we address Interior's argument the City's complaint must be dismissed because the City no longer has a legally cognizable interest in the outcome.  Interior argues the City's claim is moot because two other federal agencies have since filled "the only [central business area] site that the City identified as available for selection."  Interior asserts that since "the site the City really wanted Interior to build upon ... is no longer available and no other known site exists," any alleged harm the City suffered can no longer be redressed.

The Supreme Court has held, under the "case or controversy" requirement in Article III of the Constitution, "federal courts are without power to decide

questions that cannot affect the rights of litigants in the case before them." *North Carolina v. Rice*, 404 U.S. 244, 246 (1971). "A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (quotation marks and citations omitted). The crucial question is whether "granting a present determination of the issues offered ... will have some effect in the real world." *Kennecott Utah Copper Corp. v. Becker*, 186 F.3d 1261, 1266 (10th Cir. 1999) (quotation marks and citations omitted).

We conclude the City's claim is not moot. In this case, the parties disagree as to whether there is any available property within the central business area. As we explained in Part B of this opinion, Interior asserts there are no appropriate sites within the central business area, while the City's complaint can reasonably be read as alleging there are several sites available. Accepting the City's allegations as correct, if Interior issued a new solicitation of offers for its new space and followed the applicable executive order and regulations, it may very well select a site within the central business area. Thus, the City's asserted injury related to the development and revitalization of this area could be remedied. We, therefore, conclude the City's challenge is not moot.

## CONCLUSION

Based on the preceding analysis we **REVERSE** and **REMAND** for further proceedings consistent with this opinion.