* James Mattis, Secretary of Defense, is substituted as a party in place of his predecessor, Ashton Carter. In addition, Robert M. Speer,

ingly, White is entitled to qualified immunity. *Id.* at 1222-23. And because White is entitled to qualified immunity, his conduct "cannot serve as the basis of liability for" Mariscal and Truesdale. *Id.* Thus, all three defendants are entitled to summary judgment and we must reverse and remand with directions to enter judgment in their favor. *Id.* at 1223.

**State of KANSAS, BY AND THROUGH the KANSAS DEPARTMENT FOR CHILDREN AND FAMILIES, Plaintiff-Appellee,**

v.

**SOURCEAMERICA; Lakeview Center, Inc., Intervenors Defendants-Appellants,**

**and**

**United States, by and through Honorable James Mattis, Secretary of Defense, and Honorable Ryan D. McCarthy, Secretary of the Army,\* Defendants.**

No. 16-3228

United States Court of Appeals, Tenth Circuit.

FILED October 31, 2017

Acting Secretary of the Army, is substituted as a party in place of his predecessor, Patrick J. Murphy. *See* Fed. R. App. P. 43(c)(2).

Craig A. Holman (Robert A. DeRise and Sonia Tabriz with him on the briefs), Arnold & Porter LLP, Washington, DC, for Intervenors Defendants-Appellants.

Peter A. Nolan, Winstead PC, Austin, Texas (David W. Davies, General Counsel, Kansas Department for Children and Families, Topeka, Kansas, with him on the briefs), for Plaintiff-Appellee.

Before BACHARACH, PHILLIPS, and McHUGH, Circuit Judges.

McHUGH, Circuit Judge.

This interlocutory appeal concerns a contract dispute about the provision of food services at the Fort Riley Army base in Kansas. The root of the dispute is the intersection of two federal statutes that both address the procurement of food services at federal facilities: (1) the Randolph-Sheppard Vending Facility Act of 1936 (RSA), and (2) the Javits Wagner O'Day Act (JWOD). The parties disagree as to which of these statutes governs the award of the Fort Riley food services contract. And due to events that have occurred since this action was filed, the parties also dispute whether this appeal has been rendered moot.

We first conclude that the issue raised by this appeal falls within an exception to the mootness doctrine for matters capable of repetition yet evading review. Next, we hold that the district court properly exercised subject-matter jurisdiction over this matter. But given the current posture of this case, we decline to address which statute governs the contract at issue or whether the district court properly granted injunctive relief.

## I. BACKGROUND

The Department of the Army (Army) contracts with outside vendors for food preparation and related supporting services for its cafeteria dining facilities at Fort Riley. Since 2006, the State of Kansas, through the Kansas Department for Children and Families (Kansas), has successfully bid under the RSA on those food preparation and related services contracts at Fort Riley. Kansas's most recent con-

tract awarded under the RSA was scheduled to expire in February 2016.

As that date approached, the Army determined that its next dining contract at Fort Riley would be for supporting services only. The Army therefore decided that it need not solicit bids under the RSA and it approached another vendor directly, as permitted by the JWOD. Kansas took exception to the Army's decision because it eliminated Kansas's ability to bid on the contract. So Kansas initiated arbitration proceedings under the RSA's dispute resolution provisions. And upon learning that the Army intended to contract with the other vendor despite the commencement of arbitration proceedings, Kansas sued in federal court, seeking to preliminarily enjoin the Army from executing the JWOD contract pending arbitration.

The district court granted Kansas's request for a preliminary injunction pending arbitration. Two entities with an interest in the JWOD contract, SourceAmerica and Lakeview Center, Inc. (collectively, Intervenors), then intervened, and argued, among other things, that the district court lacked subject-matter jurisdiction to issue the preliminary injunction. The district court rejected Intervenors' arguments; Intervenors filed a timely appeal. Exercising jurisdiction under 28 U.S.C. § 1292(a)(1), we now affirm.

To place our analysis in context, we begin with an overview of the RSA and the JWOD, as well as relevant legislative developments. Next, we provide the factual and procedural history of the dispute between Kansas and the Army. Finally, we address the legal issues raised by this appeal. We first conclude that the case is not moot, despite the arbitration decision rendered during the pendency of this appeal. Second, we conclude that the district court properly exercised subject-matter jurisdiction over this matter.

## A. Statutory and Regulatory Background

### 1. The RSA

Congress enacted the RSA to "enlarg[e] the economic opportunities of the blind" by giving them priority in the bidding of contracts "to operate vending facilities on any Federal property." 20 U.S.C. § 107. Vending facilities under the RSA include cafeterias on military bases like Fort Riley. *See id.* § 107e(7); *Kentucky v. U.S. ex rel. Hagel*, 759 F.3d 588, 592 (6th Cir. 2014). Although the RSA applies to all federal agencies, Congress charged the Secretary of the Department of Education (DOE) with administering, interpreting, enforcing, and resolving disputes arising under the RSA. *See* 20 U.S.C. §§ 107(b), 107a, 107d-1. Indeed, the Secretary must "prescribe regulations to establish a priority for the operation of cafeterias" on federal property by blind vendors. *Id.* § 107d-3(e). Those regulations provide that all contracts "pertaining to the operation of cafeterias on Federal property" are subject to the RSA. 34 C.F.R. § 395.33(c).

Under the RSA, the Secretary designates a State Licensing Agency (SLA) in each state to issue licenses to qualified blind persons to operate vending facilities on federal property. 20 U.S.C. § 107a(a)(5). Plaintiff-Appellee Kansas Department for Children and Families is the designated SLA in Kansas. When a federal agency procures vending-facility services, it does not contract directly with a blind vendor. The agency instead negotiates a contract directly with the SLA or solicits competitive bids for the contract. 34 C.F.R. § 395.33(b), (d); *see Kansas v. United States*, 171 F.Supp.3d 1145, 1148 (D. Kan. 2016). If the federal agency solicits bids, it must invite the SLA to bid on the contract. 34 C.F.R. § 395.33(b). The

SLA then selects a licensed blind vendor and submits a bid on that vendor's behalf if the vendor can provide services "at comparable costs and of comparable high quality." *Id.* If the SLA's bid is "within a competitive range and has been ranked among those proposals which have a reasonable chance of being selected for final award," then the procuring agency must consult with the Secretary. *Id.* The Secretary must then give priority to the blind vendor if she determines that the "operation can be provided at a reasonable cost" and at a comparatively "high quality." *Id.* § 395.33(a). If the SLA and its blind vendor are awarded the contract, then the blind vendor operates the dining facility and manages the day-to-day operations. When a contract nears expiration, the federal agency may negotiate directly with the SLA to renew the contract, or it may open bidding to the general public, triggering the procedures outlined above. 34 C.F.R. § 395.33(d); *Hagel,* 759 F.3d at 592.

The RSA provides for arbitration of all disputes between an SLA and a federal agency that has solicited vending-facility services. 20 U.S.C. § 107d-1(b). If an SLA determines that a federal agency "is failing to comply" with the RSA or any regulation issued thereunder, then the SLA "may file a complaint with the Secretary" of the DOE. *Id.* In the event the SLA files a complaint, the Secretary "shall convene a panel to arbitrate the dispute ... and the decision of such panel shall be final and binding on the parties." *Id.* If the arbitration panel "finds that the acts or practices" of the federal agency are in violation of the RSA or any regulation issued thereunder, then the head of the federal agency "shall cause such acts or practices to be terminated promptly and shall take such other action as may be necessary to carry out the decision of the panel." *Id.* § 107d-2(b)(2). The arbitration panel's decision is subject to judicial review as a final agency action under the Administrative Procedure Act (APA). *Id.* § 107d-2(a); *see* 5 U.S.C. § 706(2)(A) (stating a court may set aside an agency's decision only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

## 2. The JWOD

The JWOD likewise applies to services rendered on federal properties. The JWOD's purpose is "to increase employment and training opportunities for persons who are blind or have other severe disabilities through the purchase of commodities and services from qualified nonprofit agencies employing persons who are blind or have other severe disabilities." 41 C.F.R. § 51-1.1(a); *see also* 41 U.S.C. § 8502 (titled "Committee for Purchase From People Who Are Blind or Severely Disabled"). To implement this policy, Congress created a committee now known as the AbilityOne Commission (Commission), *see* 41 U.S.C. § 8502; Committee for Purchase From People Who Are Blind or Severely Disabled, 71 Fed. Reg. 68492-01 (Nov. 27, 2006) (to be codified at 41 C.F.R. pts. 51-1, 51-2, 51-3, 51-4, and 51-6), and charged it with promulgating implementing regulations, *see* 41 U.S.C. § 8503(d).

The Commission oversees the so-called AbilityOne Program (Program), under which the Commission must "maintain and publish in the Federal Register a procurement list." *Id.* § 8503(a). The procurement list consists of products produced and services provided by qualified nonprofit agencies that the Commission deems suitable for the federal government's procurement. *Id.* Federal government entities are required to procure the products and services on the procurement list pursuant to the Commission's regulations and at the price set by the Commission. *Id.* § 8504(a).

The Commission works with two "central nonprofit agenc[ies]" to administer the Program. *See id.* § 8503(c); 41 C.F.R. § 51-3.1. The central nonprofit agencies represent the interests of the participating nonprofit agencies that employ individuals who are blind or have other severe disabilities. 41 C.F.R. § 51-3.1. SourceAmerica is one of the central nonprofit agencies, and Lakeview is a participating nonprofit agency.

The central nonprofit agencies are required to identify possible services to include on the procurement list. 41 C.F.R. § 51-3.2. If the Commission determines that the service is suitable to add to the procurement list, it publishes a notice in the *Federal Register* of its intent to do so. *See id.* § 51-2.2(b). Interested persons then have thirty days to comment on the proposed addition, after which the Commission determines whether the service is suitable to add to the procurement list. *See id.* §§ 51-2.3, -2.4. As stated, once a service is added to the procurement list, federal entities must procure that service from a designated qualified nonprofit agency. 41 U.S.C. § 8504(a); *see also* 41 C.F.R. § 51-1.2(a) ("The JWOD Act mandates that commodities or services on the Procurement List required by Government entities be procured ... from a nonprofit agency employing persons who are blind or have other severe disabilities[.]").

### 3. Legislative Developments

In 2003, this court held that the RSA applies over the JWOD to dining facility contracts on military bases because the RSA specifically "prescribes a priority for blind vendors in the operation of cafeterias on federal property, whereas the JWOD is a more general procurement statute." *NISH v. Rumsfeld*, 348 F.3d 1263, 1272 (10th Cir. 2003); *accord NISH v. Cohen*, 247 F.3d 197, 205 (4th Cir. 2001) (similar).

But in 2006, Congress passed § 848 of the National Defense Authorization Act for Fiscal Year 2006 (2006 NDAA). *See* Pub. L. No. 109-163, § 848, 119 Stat. 3136 (2006). In § 848, Congress directed the DOE, the Commission, and the Department of Defense (DOD) to issue a joint statement of policy concerning the two Acts' application to the operation and management of military dining facilities. *Id.*

In August 2006, the three agencies submitted to Congress a joint report (2006 Joint Report) after providing for notice and comment in the *Federal Register*. The agencies made several recommendations to Congress, including:

> (1) that Congress should enact a "no poaching" provision which would require existing contracts to remain governed by the procurement statute already in place for those contracts; (2) that the RSA should apply to contracts when the contractor will exercise management responsibility and day-to-day decision-making for the overall functioning of the facility; and (3) that the JWOD should apply when the [DOD] needs dining support services but [DOD] personnel are exercising overall functional and management responsibilities.

*Kansas*, 171 F.Supp.3d at 1160. The agencies further agreed that they would "promptly implement complementary regulations reflecting the joint policy" to "significantly clarify and improve the application of [the] JWOD and [RSA] to military dining facilities contracts." The agencies then clarified in a follow-up report that they had recommended in their 2006 Joint Report "that RSA contractor priority apply only where the RSA contractor will operate an *entire* dining facility." *Id.* But the agencies have yet to issue regulations implementing their recommendations. And the DOD instructed in a 2007 memorandum that the 2006 Joint Report "should

not be cited in individual solicitations until it is implemented in complementary regulations by the [DOE] and [DOD]."

Also in 2006, Congress enacted the "no poaching" provision in § 856 of the John Warner National Defense Authorization Act for Fiscal Year 2007 (2007 NDAA). Pub. L. No. 109-364, § 856, 120 Stat. 2083 (2006). Congress explained that the contracts covered under the "no poaching" provision include "a food service contract ... for full food services, mess attendant services, or services supporting the operation of all or any part of a military dining facility ... that was awarded under either the [RSA] or the [JWOD]." *Id.* Congress has not enacted any of the other recommendations from the agencies' 2006 Joint Report.

Next, Congress passed the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015 (2015 NDAA). Pub. L. No. 113-291, 128 Stat. 3292 (2014). In an accompanying Joint Explanatory Statement, Congress noted that there is still a need for regulatory guidance on the competing applications of the RSA and the JWOD. It also stated: "Pursuant to the [2006 Joint Report], the [RSA] applies to contracts for the operation of a military dining facility, or full food services, and the [JWOD] applies to contracts and subcontracts for dining support services, or dining facility attendant services, for the operation of a military dining facility." Congress then directed the Secretary of Defense to implement the 2006 Joint Report by promulgating regulations explaining how the two Acts should apply to new contracts. Congress gave the Secretary of Defense 180 days after the 2015 NDAA's enactment to do so. The Secretary did not meet this deadline. But on June 7, 2016, the Secretary of Defense issued a proposed rule that would implement the 2006 Joint Report and the 2015 Joint Explanatory Statement. *See* Food Services for Dining Facilities on Military Installations, 81 Fed. Reg. 36,506 (June 7, 2016). The notice and comment period closed in August 2016, and, according to Intervenors, a final rule is forthcoming but has not yet been issued.

## B. *The Dispute Between the Army and Kansas*

Fort Riley is an active military base in Kansas. In order to support its logistical functions while soldiers were deployed, the Army hired contractors to provide Full Food Service (FFS) and Dining Facility Attendant (DFA) services at the base. "FFS contracts are more expansive and typically involve food preparation." *Kansas*, 171 F.Supp.3d at 1149 n.3. "DFA contracts generally exclude food preparation," but often include "closely related enterprises such as cleaning and sanitation of the dining facility and washing dishes, pots, and pans." *Id.*

The Army solicited competitive bids under the RSA for its last two dining facility service contracts at Fort Riley. *Id.* at 1149. Kansas successfully bid on both contracts, suggesting that Kansas's bids "were sufficiently competitive." *Id.* Kansas received its first FFS contract at Fort Riley in June 2006 and its second FFS contract in September 2011. The second FFS contract was set to expire on August 31, 2015, but it was extended during this litigation until February 29, 2016.

The Army determined its next contract at the base will only be for DFA services because soldiers returning to Fort Riley from deployment could resume operating the military dining facilities. The contracting authorities at Fort Riley determined that a contract for only DFA services was not subject to the RSA, and that such services could instead be procured under the JWOD. *Id.* at 1150. So Fort Riley's

contracting authorities approached SourceAmerica to see if the Commission was interested in a DFA services contract. And on March 16, 2015, the Commission sent the DOE a letter notifying it that the Commission may add DFA services at Fort Riley to the procurement list.

After learning of these developments, Kansas asked the Army to comply with the RSA. *Id.* at 1151. The Army refused. *See id.* And on May 7, 2015, Kansas filed a complaint with the Secretary of the DOE, requesting the Secretary "to commence an arbitration proceeding to determine whether the Army had violated the RSA by not procuring the [DFA] services under the RSA." *Id.*

Undeterred, on July 17, 2015, the Commission published notice in the *Federal Register* for comment on the proposed addition of DFA services at Fort Riley to the procurement list. *See* Procurement List; Proposed Additions and Deletions, 80 Fed. Reg. 42481-01 (July 17, 2015). After receiving no public comments, on January 22, 2016, the Commission approved the addition of DFA services at Fort Riley to the procurement list. *Kansas,* 171 F.Supp.3d at 1151. The Commission formally designated Lakeview as the mandatory source of DFA services effective February 21, 2016. *See* Procurement List; Addition and Deletions, 81 Fed. Reg. 3783-02 (Jan. 22, 2016).

### C. *Procedural History*

On July 22, 2015, after learning the Army intended to proceed under the JWOD, Kansas filed its Complaint in the United States District Court for the District of Kansas. Kansas alleged the United States (i.e., the Army) violated the RSA by asking the Commission to add the DFA services to the procurement list, thereby eliminating Kansas's right to compete for services under the RSA's priority bidding procedures.

Kansas sought to preliminarily enjoin the Army from procuring dining facility services at Fort Riley under the JWOD pending resolution of the RSA-mandated arbitration proceeding before the DOE.[1] The Army opposed the request, arguing it does not have to give Kansas an opportunity to bid on the DFA contract because DFA contracts do not fall under the RSA. *Kansas,* 171 F.Supp.3d at 1151. After holding an evidentiary hearing, the district court granted the request for a preliminary injunction. *Id.* at 1152. The court enjoined the Army from:

> conducting any procurement, including making any award of contract in connection with cafeteria services at Fort Riley, except as permitted under the RSA and its regulations, until such time as the arbitration proceeding initiated by Kansas under the RSA is concluded, or further order modifying this preliminary injunction.

*Id.*[2]

The district court then granted Intervenors' motion to intervene. *Kansas v. United States,* 192 F.Supp.3d 1184, 1188 (D. Kan. 2016). Intervenors subsequently moved to dismiss for lack of subject-matter jurisdiction and, alternatively, to alter, amend, or vacate the preliminary injunc-

---

1. Kansas initially requested both preliminary and permanent injunctive relief. But Kansas later sought, and was granted, leave to file an Amended Complaint in which it requested only preliminary injunctive relief. *Kansas v. United States,* 171 F.Supp.3d 1145, 1167–71 (D. Kan. 2016).

2. In March 2016, the district court also denied the Army's Federal Rule of Civil Procedure 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. *Kansas,* 171 F.Supp.3d at 1166–67. That decision is not challenged on appeal.

tion. *Id.* at 1186. They maintained that the United States Court of Federal Claims has exclusive jurisdiction over this case under the Tucker Act; that even if the Court of Federal Claims did not have exclusive jurisdiction, the district court could not exercise its jurisdiction until arbitration was exhausted; and that even if the district court had jurisdiction, the court erred in granting a preliminary injunction. *Id.* at 1188–89. The court rejected Intervenors' arguments and upheld the injunction. *See id.* at 1190–1215. Intervenors then appealed.

While this case was pending on appeal, an arbitration panel convened by the Secretary of the DOE held a hearing to determine whether the RSA applies to the DFA services contract at issue. On May 9, 2017, the arbitration panel concluded that the RSA applies to the Fort Riley procurement and that the Army violated the RSA by failing to apply the RSA priority procedures in the solicitation of DFA services at Fort Riley. The arbitration panel also determined the Army violated the "no poaching" provision of the 2007 NDAA. In view of the arbitration panel's decision, we asked the parties to submit supplemental briefing on whether this appeal is moot.

## II. ANALYSIS

We first consider whether the arbitration panel's ruling rendered this appeal moot. Concluding that this case is capable of repetition yet evading review and thus justiciable, we next address Intervenors' arguments that the Court of Federal Claims has exclusive jurisdiction over this case and that the district court did not

have jurisdiction to grant Kansas's request for a preliminary injunction.[3] We conclude that the district court properly exercised its subject-matter jurisdiction over this dispute.

### A. Mootness

■■■ "Article III of the Constitution limits federal courts to deciding 'Cases' and 'Controversies,' and an actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation." *Kingdomware Techs., Inc. v. United States,* —— U.S. ——, 136 S.Ct. 1969, 1975, 195 L.Ed.2d 334 (2016) (internal quotation marks omitted). "In considering mootness, we ask whether granting a *present* determination of the issues offered will have some effect in the real world." *Fleming v. Gutierrez,* 785 F.3d 442, 444–45 (10th Cir. 2015) (internal quotation marks omitted). "[I]f an event occurs while a case is pending on appeal that makes it impossible for the court to grant any effectual relief whatever to a prevailing party, we must dismiss the case, rather than issue an advisory opinion." *Id.* at 445 (internal quotation marks omitted). "In the case of an interlocutory appeal taken from the grant of a preliminary injunction, the appeal is moot where the effective time period of the injunction has passed." *Id.* (internal quotation marks omitted).

■■■ Kansas argues that this appeal is moot because the arbitration panel's decision resolved all substantive issues in dispute and we are no longer capable of granting any effectual relief. Indeed, Kansas maintains there is no longer a live case or controversy because the effective time

---

**3.** Intervenors also argue that the district court abused its discretion when it granted Kansas's request for a preliminary injunction. In issuing the injunction, the district court concluded that Kansas was substantially likely to succeed in arbitration. *See Kansas,* 171 F.Supp.3d at 1165 ("[T]he Court finds that Kansas has shown a substantial likelihood of success in arbitration."). Because we now know that Kansas has succeeded in arbitration, we decline to address whether the district court erred in granting the injunction.

period of the preliminary injunction was to expire once the arbitration panel issued its decision. For their part, Intervenors argue this appeal is not moot because it fits within a special category of disputes that are capable of repetition yet evading review. Under this exception to mootness, a dispute remains live if "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again." *Turner v. Rogers*, 564 U.S. 431, 439–40, 131 S.Ct. 2507, 180 L.Ed.2d 452 (2011) (internal quotation marks omitted). Intervenors, as the parties asserting that the exception applies, bear the burden of showing that this dispute is capable of repetition yet evading review. *See Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1229 (10th Cir. 2012).

The Supreme Court's decision in *Kingdomware* is instructive. There, the Court considered the impact of federal statutes designed to encourage small businesses. 136 S.Ct. at 1973. One of those statutes is the Small Business Act, which requires the Department of Veterans Affairs (DVA), as well as other federal agencies, to set aside contracts to be awarded to small businesses, including small businesses owned and controlled by service-disabled veterans. *Id.* In addition, the Veterans Benefits, Health Care, and Information Technology Act of 2006 (Act) requires the Secretary of Veterans Affairs to set specific annual goals that encourage contracting with veteran-owned and service-disabled veteran-owned small businesses. *Id.* The Act's "Rule of Two" provides that the DVA "shall award" contracts "by restricting competition for the contract to service-disabled or other veteran-owned small businesses." *Id.* To do so, the contracting officer "must reasonably expect that at least two of these businesses will submit

offers and that 'the award can be made at a fair and reasonable price that offers best value to the United States.'" *Id.* at 1973–74 (quoting 38 U.S.C. § 8127(d)). In finalizing regulations implementing the Act, the DVA stated in a preamble that § 8127's procedures do not apply to Federal Supply Schedule (FSS) task or delivery orders. *Id.* at 1974. The FSS is a streamlined method for government agencies to acquire certain supplies and services in bulk, such as office supplies. *Id.*

Kingdomware is a service-disabled veteran-owned small business that provides emergency notification services. *Id.* In January 2012, the DVA decided to procure such services for four VA medical centers. *Id.* But it did so through the FSS, bypassing the Rule of Two and awarding the contract to a non-veteran-owned company. *Id.* at 1974–75. Kingdomware filed a bid protest with the Government Accountability Office (GAO), and the GAO issued a non-binding decision agreeing with Kingdomware that the DVA's failure to apply the Rule of Two was unlawful. *Id.* at 1975. The DVA disagreed with the GAO's decision. *Id.* Kingdomware therefore filed suit in the Court of Federal Claims for declaratory and injunctive relief, arguing that § 8127(d) requires the DVA to apply the Rule of Two to all contracts awarded. *Id.* The Court of Federal Claims sided with the DVA, and the Federal Circuit affirmed. *Id.*

The Supreme Court granted certiorari to determine whether § 8127(d) requires the DVA to apply the Rule of Two in all contracting. *Id.* But before the Court addressed the merits, it considered whether the matter was moot. *Id.* Although the Court acknowledged that no court could grant Kingdomware the relief it sought because performance of the procurement was complete, the Court held that the case fell within the exception for disputes capa-

ble of repetition yet evading review. *Id.* at 1975–76.

The Court first held that the procurement was fully performed in less than two years after it was awarded and was therefore too short to permit full litigation of the issue. *Id.* at 1976. It then concluded that "it is reasonable to expect that the [DVA] will refuse to apply the Rule of Two in a future procurement for the kind of services provided by Kingdomware." *Id.* After all, the preamble to the DVA's implementing regulations permit the DVA to do just that, stating that the Rule of Two does not apply to FSS task or delivery orders. *See id.* at 1974. And the DVA procured the emergency notification services at issue in accordance with that interpretation. *See id.* But,

> [i]f Kingdomware's interpretation of § 8127(d) is correct, then the [DVA] must use restricted competition rather than procure on the open market. And Kingdomware, which has been awarded many previous contracts, has shown a reasonable likelihood that it would be awarded a future contract if its interpretation of § 8127(d) prevails. See Decl. of Corydon Ford Heard III ¶¶ 11–15 (explaining that the company continues to bid on similar contracts).

*Id.* at 1976. As a result, the Court determined that it had jurisdiction "because the same legal issue in this case is likely to recur in future controversies between the same parties in circumstances where the period of contract performance is too short to allow full judicial review before performance is complete." *Id.*

■ Similarly, we conclude that this appeal falls within the exception for disputes that are capable of repetition yet evading review. First, the Army's procurement process under the JWOD was too short in duration to be fully litigated prior to its completion. Recall that on March 16, 2015,

the Commission notified the DOE that it may add DFA services at Fort Riley to the procurement list pursuant to the JWOD. Then on July 17, 2015, the Commission published notice in the *Federal Register* for comment on the proposed addition of DFA services at Fort Riley to the procurement list. And on January 22, 2016, the Commission approved the addition of DFA services at Fort Riley to the procurement list and formally designated Lakeview as the mandatory source of those services effective February 21, 2016, eight days before Kansas's prior contract was set to expire. In all, the procurement process lasted less than one year, demonstrating that the controversy expires too quickly for Kansas to fully litigate the matter. *See Kentucky v. U.S. ex rel. Hagel,* 759 F.3d 588, 596 (6th Cir. 2014) (holding in a similar dispute concerning the RSA's applicability to a procurement of DFA services at an Army base that the controversy was too short to be fully litigated where less than one year passed between the time the Army posted its solicitation and when the new vendor's contract went into effect); *see also Kingdomware,* 136 S.Ct. at 1976 ("We have previously held that a period of two years is too short to complete judicial review of the lawfulness of [a government] procurement."); *Turner,* 564 U.S. at 440, 131 S.Ct. 2507 (noting that twelve-month, eighteen-month, and two-year periods qualify as too short in duration to be fully litigated).

Second, there is a reasonable expectation that the Army will refuse to apply the RSA to future procurements of dining services at Fort Riley. Just as the preamble to the DVA's implementing regulations supported the DVA's view that the Rule of Two does not apply to FSS task or delivery orders, the 2006 Joint Report, the 2015 NDAA's Joint Explanatory Statement, and the DOD's proposed regulations all sup-

port the Army's view that the RSA does not apply to DFA contracts. Also like the DVA, the Army acted on its belief, attempting to procure DFA services at Fort Riley pursuant to the JWOD. But if Kansas's interpretation of the RSA is correct, the Army must procure DFA contracts pursuant to the RSA, rather than pursuant to the JWOD. And Kansas, which has been awarded at least two prior contracts at Fort Riley, has shown a reasonable likelihood that it would be awarded a future contract if its interpretation of the RSA prevails. Kansas's two prior bids were sufficiently competitive, suggesting its future bids would be too.

Accordingly, this appeal is not moot. The same issues in this case are likely to recur in future controversies between the same parties in circumstances where the procurement period is too short in duration to be fully litigated before its completion. *See Hagel*, 759 F.3d at 597 (concluding that the controversy was capable of repetition yet evading review because "[i]t does not appear likely that the Army will stop needing [DFA] services, nor does it appear likely that [the SLA] will stop asserting that the [RSA] applies to these contracts").

The dissent concludes that this appeal is moot, and in doing so faults Intervenors for failing to make arguments on appeal like those made in *Hagel*. But our conclusion does not rest solely on *Hagel*; it also rests on *Kingdomware*. Even so, Intervenors *did* in fact argue that *Hagel* (and *Kingdomware*) apply here. On page one of Intervenors' Supplemental Brief, Intervenors cite *Hagel* and *Kingdomware*. In both cases the court held that the dispute was capable of repetition yet evading review. *See Kingdomware*, 136 S.Ct. at 1976; *Hagel*, 759 F.3d at 595–97. Intervenors then argue that "[t]he same is true here." Intervenors again rely on *Hagel* on pages five through seven of their Supplemental Brief,

stating on page seven that "[t]he Sixth Circuit's reasoning and holding in *Hagel* are fully applicable here on the question of mootness, and demonstrate why, even after the RSA arbitration decision issued, the appeal is not moot—it is capable of repetition yet evading review." And in arguing there is a reasonable expectation that this dispute will be litigated again, Intervenors contend that, "[a]s in *Hagel*, 'there is a reasonable expectation that a district court, in the not so distant future, will face a request that it issue an injunction to stay the award of a contract pending arbitration involving these parties.'" This is sufficient to invoke the analysis and reasoning in *Hagel* and *Kingdomware*.

Concluding that this appeal is not moot, we now turn to the question of whether the district court correctly ruled that the Court of Federal Claims does not have exclusive jurisdiction over this case.

## B. The United States Court of Federal Claims' Jurisdiction

Intervenors argue that the district court did not have subject-matter jurisdiction to preliminarily enjoin the Army's ongoing procurement of DFA services under the JWOD because the Tucker Act vests the Court of Federal Claims with exclusive jurisdiction over this "paradigmatic bid protest." In rejecting this argument below, the district court acknowledged that the Tucker Act confers exclusive jurisdiction upon the Court of Federal Claims over bid protests against the federal government. *See Kansas v. United States*, 192 F.Supp.3d 1184, 1191–92 & n.5 (D. Kan. 2016). But relying on *Kentucky, Education Cabinet, Department for the Blind v. United States*, 424 F.3d 1222 (Fed. Cir. 2005), the district court ruled that any Tucker Act jurisdiction is preempted until mandatory arbitration under the RSA is complete because Kansas alleges in its Complaint

that the Army violated the RSA. *See Kansas*, 192 F.Supp.3d at 1193–99. Intervenors argue that the district court erred in following *Kentucky, Education.* We are not persuaded.

### 1. Standard of Review

 We review de novo the district court's ruling on subject-matter jurisdiction. *Niemi v. Lasshofer*, 770 F.3d 1331, 1344 (10th Cir. 2014). Because Intervenors seemingly direct their jurisdictional challenge at the allegations in Kansas's Complaint, we presume that those allegations are true. *See City of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901, 906 (10th Cir. 2004). We also review de novo the district court's interpretation of a federal statute. *United States v. Fillman*, 162 F.3d 1055, 1056 (10th Cir. 1998).

### 2. Discussion

 "[F]ederal courts are courts of limited jurisdiction," *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978), the metes and bounds of which are prescribed by Congress, *Kontrick v. Ryan*, 540 U.S. 443, 452, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004) (citing U.S. Const. art. III, § 1). Subject-matter jurisdiction, in particular, refers to "the courts' statutory or constitutional *power* to adjudicate [a] case." *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). When a court's subject-matter jurisdiction over a dispute is raised—either sua sponte by the court or by a party—the plaintiff, the party invoking federal jurisdiction, must show that jurisdiction exists. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). If the plaintiff fails to establish jurisdiction "with the manner and degree of evidence required at … [that] stage[ ] of the litigation," the court must dismiss the case. *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130; *see* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

 As an initial matter, the United States, which is a defendant here, is immune from suit unless it expressly and unequivocally waives its sovereign immunity. *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980). Kansas contends that the district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because its claim arises under § 107d-1(b) of the RSA and the APA's provisions providing for judicial review of a final agency action. The APA does not confer subject-matter jurisdiction upon the federal courts, and § 1331 does not waive sovereign immunity. But the APA does contain a limited waiver of the United States' sovereign immunity: it permits "[a] person suffering legal wrong because of agency action" to "seek[ ] relief other than money damages" in federal court. 5 U.S.C. § 702; *see City of Albuquerque*, 379 F.3d at 906–07. Here, Kansas sought nonmonetary relief to remedy an alleged wrong inflicted upon it by a federal agency: it requested a preliminary injunction while it sought to remedy in arbitration the Army's alleged violation of the RSA. The APA's waiver of sovereign immunity is "limited because it does not 'confer [ ] authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" *City of Albuquerque*, 379 F.3d at 907 (quoting 5 U.S.C. § 702). As a result, "we must read [APA] § 702 in conjunction with other jurisdictional statutes waiving sovereign immunity" to determine whether the district court had jurisdiction under § 1331 and the RSA. *Id.* (citation omitted).

██ Intervenors contend that the other waiver of sovereign immunity at issue is the Tucker Act, as amended by the Administrative Dispute Resolution Act. *See* 28 U.S.C. § 1491. The Tucker Act waives the United States' sovereign immunity for government contract protest actions, and its amendments vest the Court of Federal Claims with exclusive jurisdiction to hear those Tucker Act claims.[4] *See City of Albuquerque*, 379 F.3d at 907; *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1079–80 (Fed. Cir. 2001). If Kansas sought relief under the Tucker Act, then it was barred from pursuing its claim in district court.

 Under the Tucker Act, the Court of Federal Claims has jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation ·in connection with a procurement or a proposed procurement. 28 U.S.C. § 1491(b)(1). An "interested party" is an "actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *City of Albuquerque*, 379 F.3d at 910 (quoting *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001)). And a "procurement includes all stages of the process of acquiring property or services, beginning with the process for determining a need

for property or services and ending with contract completion and closeout." *Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1244 (Fed. Cir. 2010) (internal quotation marks omitted).

Intervenors contend that Kansas's suit was a bid protest directly challenging an ongoing JWOD procurement that falls squarely within the scope of the Tucker Act and the Court of Federal Claims' exclusive jurisdiction. And according to Intervenors, Kansas concedes that it is an "interested party," that the Fort Riley contract was a "procurement," and that it seeks a preliminary injunction to prevent this procurement. We reject Intervenors' argument and instead find the Federal Circuit's analysis in *Kentucky, Education* instructive.

There, the Army issued a solicitation for bids on a DFA contract at Fort Campbell, Kentucky. *Kentucky v. United States*, 62 Fed.Cl. 445, 449 (2004). The solicitation itself said the contract was subject to the RSA, and an SLA submitted a bid on the contract. *Id.* at 449–50. The Army classified the SLA's past performance as "Very Good," *id.* at 450, and the SLA's price proposal as "Satisfactory," *Kentucky, Educ.*, 424 F.3d at 1224. But the Army concluded that the SLA's bid fell outside the "competitive range," so the bid did not receive priority, and the SLA did not receive the contract. *Id.*

The SLA filed a bid protest action in the Court of Federal Claims, asserting that the Army should have included the SLA's

4. When originally enacted in 1996, the Administrative Dispute Resolution Act (ADRA) amended the Tucker Act and gave federal district courts and the Court of Federal Claims subject-matter jurisdiction over government contract protest actions. *See City of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901, 907 (10th Cir. 2004) (citation omitted). But the ADRA contained a so-called sunset

provision stating that the jurisdiction of the district courts would terminate on January 1, 2011. *Id.* (internal quotation marks omitted). "Congress did not act, and the sunset provision has since taken effect," meaning the Court of Federal Claims has exclusive jurisdiction over government contract protest actions. *Id.* at 907, 909.

bid within the competitive range. *Id.* The SLA argued that the Army's failure to include it violated the Competition in Contracting Act, a federal procurement statute requiring federal agencies to comply with the evaluation procedures and criteria set forth in solicitations and that Act's attendant regulations. *See Kentucky,* 62 Fed.Cl. at 460. The SLA requested that the Court of Federal Claims enjoin the Army from proceeding with performance of the contract awarded to another bidder pending resolution of the SLA's bid protest on the merits by the court or in arbitration under the RSA. *Id.* at 451. The government moved to dismiss the SLA's complaint for lack of subject-matter jurisdiction, and the Court of Federal Claims dismissed on those grounds. *See Kentucky, Educ.,* 424 F.3d at 1224. Although the SLA insisted that its claim did not arise under the RSA, the Court of Federal Claims concluded that the SLA's claim had a "reasonable nexus" to the RSA and thus the SLA had to exhaust its administrative remedies by seeking arbitration with the Secretary of the DOE before seeking a judicial remedy. *Kentucky,* 62 Fed.Cl. at 460–63.

The Federal Circuit affirmed, but on narrower grounds. *Kentucky, Educ.,* 424 F.3d at 1227. The court first held that the RSA's arbitration provisions are more limited in application than found by the Court of Federal Claims. Section 107d-1(b) of the RSA provides that when an SLA "determines that a federal agency is 'failing to comply with the provisions of this chapter or any regulations issued thereunder ... such licensing agency may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute.'" *Id.* at 1225 (quoting 20 U.S.C. § 107d-1(b)). "Accordingly, not every complaint that [an SLA] may have against a federal agency is arbitrable, but only those complaints that *allege a violation of the RSA or its attendant regulations.*" *Id.* (emphasis added); *see*

*also id.* at 1227 (holding that "it is clear that only claims that allege a violation of the RSA fall within the scope of RSA-prescribed arbitration").

The court found that the RSA's legislative history supported that interpretation of the statute. *See id.* at 1225. It explained:

> Congress enacted the arbitration provisions to fill a gap in the existing statutory scheme, under which vendors and state licensing agencies could bring claims based on a breach of contract or a violation of other federal procurement provisions, but could not bring a claim arising under the RSA. Congress specifically sought to fill that gap in a targeted fashion, covering only claims alleging a failure to comply with the RSA.

*Id.* at 1226 (citation omitted). Therefore, "common allegations such as a breach of contract or a violation of government procurement provisions" may be brought in the Court of Federal Claims without first submitting the claim to arbitration, provided that the plaintiff does not allege in its complaint a violation of the RSA. *Id.; see also id.* ("For claims relating to procurement disputes not based on the RSA and its regulations, there would be no reason to bypass conventional bid protest and federal contract remedies in favor of arbitration by panels convened by the Secretary of Education.").

Even though the SLA in *Kentucky, Education* argued that it brought its claim under the Competition in Contracting Act and the Court of Federal Claims thus had Tucker Act jurisdiction, the Federal Circuit concluded that the SLA's claims arose under the RSA. *Id.* at 1227. The SLA alleged that the Army "thwarted the regulations promulgated under the RSA by constructing the competitive range and evaluating [the SLA's] past performance in a way that avoided giving the [SLA] priori-

ty in the bidding process." *Id.* And the SLA specifically alleged in its complaint that it was entitled to the contract under the RSA and its related regulations. *Id.* Accordingly, the SLA's claims fell within the scope of the RSA's arbitration provisions. *Id.*

The Federal Circuit next held that arbitration under the RSA is a "mandatory" administrative prerequisite to seeking judicial relief. *Id.* at 1228–29; *see Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 103 (D.C. Cir. 1986) (holding that arbitration under the RSA is "mandatory"). The RSA's arbitration provisions "make clear that Congress created a comprehensive scheme for the administration of disputes arising from violations of the RSA." *Kentucky, Educ.*, 424 F.3d at 1228. And "[i]n the absence of a clear indication to the contrary, Congress's creation of a comprehensive remedial scheme is a strong indication that the scheme prescribed by statute was intended to be exclusive." *Id.* (citing *United States v. Babcock*, 250 U.S. 328, 331, 39 S.Ct. 464, 63 L.Ed. 1011 (1919) ("[W]here a statute creates a right and provides a special remedy, that remedy is exclusive.")). As a result, the court concluded that the Court of Federal Claims lacked jurisdiction because the SLA did not first exhaust its mandatory administrative remedy before seeking judicial relief. *Id.* at 1229.

■ Thus, under *Kentucky, Education*, the Court of Federal Claims lacks Tucker Act jurisdiction whenever a plaintiff alleges that a federal agency violated the RSA or its attendant regulations and the plaintiff has yet to arbitrate those claims. This is so even if the plaintiff's allegations technically fall within the scope of 28 U.S.C. § 1491(b)(1). *See Colo. Dep't of Human Servs. v. United States*, 74 Fed. Cl. 339, 349 (2006) (concluding the court lacked jurisdiction over the case in part

because the RSA's "specific and comprehensive" arbitration scheme "preempts any Tucker Act jurisdiction that might otherwise exist").

■ Here, Kansas maintains it alleged an RSA violation, triggering its obligation to arbitrate and stripping the Court of Federal Claims of Tucker Act jurisdiction until it has done so. Intervenors, however, argue that Kansas's claim is a classic bid protest falling within the scope of the Tucker Act. In resolving this dispute, we examine Kansas's "prime objective" and "essential purpose" in bringing suit, *see Burkins v. United States*, 112 F.3d 444, 449 (10th Cir. 1997) (stating that "if the plaintiff's 'prime objective' or 'essential purpose' is to recover money ... from the federal government, then the Court of Federal Claims' exclusive jurisdiction is triggered"), and "look to the complaint's substance" and "essence," "not merely its form" or "plain language," *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995). *Cf. Alamo Navajo Sch. Bd., Inc. v. Andrus*, 664 F.2d 229, 233 (10th Cir. 1981) ("The exclusive jurisdiction of the Court of Claims [over claims seeking money damages from the federal government] cannot be avoided by framing a district court complaint to appear to seek only injunctive, mandatory, or declaratory relief.").

A review of Kansas's operative Complaint demonstrates that the substance of its allegations is that the Army violated the RSA by (1) concluding that the DFA services contract at Fort Riley is not subject to the RSA, (2) asking the Commission to add the DFA services to the procurement list, and (3) eliminating Kansas's right to compete for services under the RSA's priority bidding procedures. Kansas alleges that the Army's conclusion that the RSA does not apply to the DFA services contract "not only ignore[d] the priority under the [RSA], but also preclude[d] Kan-

sas from even bidding" or "competi[ng] for award of the contract for DFA services in direct contravention of the Act." Kansas further alleges that "[it] and its licensed blind vendor will lose their status as incumbents as a result of the Army's violation of the [RSA]." Kansas therefore "seeks [a] preliminary injunction to prevent this procedure which violates the requirements of the [RSA]."

To be sure, the net effect of the injunction Kansas requested and received was to halt the Army's procurement of DFA services under the JWOD. But the disruption to the Army's procurement under the JWOD was simply incidental to Kansas's primary objective of enforcing the RSA. Indeed, Kansas's allegations do not turn on whether the Army violated the JWOD; they turn on whether the Army violated the RSA when it concluded that DFA services are not subject to the RSA and eliminated Kansas's ability to receive priority thereunder. Kansas's essential purpose in seeking an injunction was to receive priority under the RSA and to be awarded the DFA services contract at Fort Riley. Kansas thus alleged an RSA violation, triggering its obligation to arbitrate. Because there is no dispute Kansas had yet to arbitrate its claim at the time the district court issued the injunction, the Court of Federal Claims did not have jurisdiction over this case.

Intervenors insist that this case should have been heard in the Court of Federal Claims because the RSA does not apply to the procurement of DFA services at Fort Riley. The parties contest whether the DFA services contract is one for the "operation of [a] cafeteria[ ] on Federal property," 20 U.S.C. § 107d-3(e), or one at least "pertaining to the operation" of such a cafeteria, 34 C.F.R. § 395.33(c). Intervenors urged the district court, and urge us again here, to resolve this dispute. But

Congress declared that an RSA arbitration panel should decide in the first instance whether the DFA services contract is governed by the RSA. *See Weinberger*, 795 F.2d at 111 (recognizing that an RSA arbitration panel should interpret and apply the RSA in the first instance because the DOE and its Secretary are responsible for interpreting and administering the RSA); *see also Minn. Dep't of Econ. Sec. v. Riley*, 107 F.3d 648, 650 (8th Cir. 1997) (concluding that the RSA arbitration panel "did exactly what the statute authorizes" when it "decided competing [ ] vending machines at the VA Medical Center would violate the Act"); *Md. Dep't of Educ. v. Dep't of Veterans Affairs*, 98 F.3d 165, 169 (4th Cir. 1996) (holding that an RSA arbitration panel's sole responsibility is to determine whether a federal entity has violated the RSA). After all, Congress established a specific and comprehensive dispute resolution system, *see Weinberger*, 795 F.2d at 103, providing federal court review of an RSA arbitration panel's final decision under an arbitrary and capricious standard, *see* 20 U.S.C. § 107d-2(a); 5 U.S.C. § 706(2)(A). This suggests it would be inappropriate for this court or the district court to decide whether the RSA applies to the DFA services contract at Fort Riley. *See Weinberger*, 795 F.2d at 111 (stating that the Secretary of the DOE should be "given the first chance to apply his expertise" to interpret the RSA and determine its scope (citation omitted)); *cf. id.* at 103 ("Surely Congress contemplated that disputes between state agencies and government agencies could involve contract awards, such as the one at issue here. Congress nevertheless set up an arbitration scheme instead of authorizing direct resort to federal court.").

Intervenors next argue that even if Kansas raised issues under the RSA, the district court did not have the authority to intrude upon the Court of Federal Claims'

exclusive jurisdiction over bid protest actions. But as already discussed, the Court of Federal Claims' jurisdiction had yet to vest, meaning there was no exclusive Court of Federal Claims jurisdiction for the district court to intrude upon.

Finally, Intervenors cite two nonbinding cases they contend support the proposition that the Court of Federal Claims has jurisdiction over this case even if it is in fact an RSA case. First, in *Washington State Department of Services for the Blind v. United States*, 58 Fed.Cl. 781, 784 (2003), the Court of Federal Claims concluded it had jurisdiction over a case involving whether the RSA applied to a solicitation for DFA services at Fort Lewis, Washington. There, plaintiff argued in its pre-award bid protest that the RSA applied, and it moved the court to apply the primary jurisdiction doctrine and refer the issue of the RSA's applicability to the DOE for an opinion on the matter. *Id.* at 785.[5] The court ruled that the doctrine did not apply. *Id.* at 787. Yet in doing so, "the court only in passing addressed its own jurisdiction in light of the RSA's arbitration provisions." *Kentucky*, 62 Fed.Cl. at 461 (discussing *Washington State*). The court stated in a footnote that "[t]he parties have not challenged this court's jurisdiction to hear [plaintiff's] complaint notwithstanding RSA's provision of the administrative remedy of arbitration." *Wash. State*, 58 Fed. Cl. at 786 n.8. It then said it "believes that it has jurisdiction of this case under the Federal Circuit's decision in *Texas State Commission for the Blind v. United States* ... [even though] the issue of jurisdiction

was not a focus of the Federal Circuit's opinion." *Id.* Jurisdiction was the focus of the Federal Circuit's later opinion in *Kentucky, Education*, however, where the court held that the Court of Federal Claims lacks jurisdiction when a plaintiff alleges an RSA violation but has yet to arbitrate under the RSA. *See* 424 F.3d at 1225–29. *Washington State* does not apply.

Second, Intervenors maintain that the Court of Federal Claims in *North Carolina Business Enterprises Program v. United States*, 110 Fed.Cl. 354, 366–67 (2013), found Tucker Act jurisdiction over a pre-award bid protest challenging the terms of the Army's FSS solicitation, which was subject to the RSA. But the only jurisdictional issue before the court was whether plaintiffs had standing to pursue their claims. *Id.* While the court concluded that plaintiffs had standing, the court did not address whether it had jurisdiction in view of the RSA's arbitration provisions or the Federal Circuit's opinion in *Kentucky, Education*. Thus, *North Carolina* is also inapplicable.

In sum, the Court of Federal Claims lacks Tucker Act jurisdiction when a plaintiff alleges that a federal agency violated the RSA or its attendant regulations and the plaintiff has yet to arbitrate those claims. Here, Kansas alleges that the Army violated the RSA, and it had yet to arbitrate at the time the district court issued the preliminary injunction. Thus, any jurisdiction that the Court of Federal Claims may have had over any remaining procurement issues was preempted. The

---

**5.** The primary jurisdiction doctrine applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is

suspended pending referral of such issues to the administrative body for its views. *Wash. State Dep't of Servs. for the Blind v. United States*, 58 Fed.Cl. 781, 785 (2003) (quoting *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956)).

district court did not err in drawing the same conclusion.

### C. The District Court's Jurisdiction

Intervenors next contend that even if the Court of Federal Claims did not have exclusive jurisdiction over this case, the district court did not have jurisdiction to issue a preliminary injunction pending RSA arbitration because Kansas had yet to exhaust its mandatory administrative remedy of arbitration. The district court rejected this argument, ruling that the RSA's arbitration requirement is non-jurisdictional. *See Kansas v. United States*, 192 F.Supp.3d 1184, 1200–08 (D. Kan. 2016). The court also concluded that it had discretion to excuse exhaustion under the irreparable harm exception and to exercise jurisdiction over Kansas's request for a preliminary injunction. *See id.*

### 1. Standard of Review

We review the district court's ruling on subject-matter jurisdiction de novo. *Niemi v. Lasshofer*, 770 F.3d 1331, 1344 (10th Cir. 2014). Whether a statute requires exhaustion as a jurisdictional prerequisite is a question of statutory interpretation, *McQueen v. Colo. Springs Sch. Dist. No. 11*, 488 F.3d 868, 873–74 (10th Cir. 2007); *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1247 (D.C. Cir. 2004), which we also review de novo, *United States v. Fillman*, 162 F.3d 1055, 1056 (10th Cir. 1998).

### 2. Discussion

"Jurisdiction ... is a word of many, too many, meanings." *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 90, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). And the Supreme Court has warned against the "profligate" use of the term. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 510, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006). It has also instructed courts to carefully distinguish

between jurisdictional conditions, which bear on a court's power to adjudicate a case and cannot be waived, and nonjurisdictional limitations on a cause of action, which often can be. *See Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 161, 130 S.Ct. 1237, 176 L.Ed.2d 18 (2010); *Arbaugh*, 546 U.S. at 510–14, 126 S.Ct. 1235; *McQueen*, 488 F.3d at 873. We are called upon to make this distinction and determine whether the RSA's exhaustion requirement is jurisdictional or merely jurisprudential, i.e., non-jurisdictional.

In general, the exhaustion doctrine "provides that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Woodford v. Ngo*, 548 U.S. 81, 88–89, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) (internal quotation marks omitted). Courts have recognized two types of exhaustion requirements: jurisdictional exhaustion and non-jurisdictional exhaustion. *See Avocados Plus*, 370 F.3d at 1247. Jurisdictional exhaustion is rooted "in Congress' power to control the jurisdiction of the federal courts." *Id.* It requires a court to dismiss for lack of subject-matter jurisdiction whenever there has been a failure to exhaust. *McQueen*, 488 F.3d at 873.

Non-jurisdictional exhaustion "is a judicially created doctrine requiring parties who seek to challenge agency action to exhaust available administrative remedies before bringing their case to court." *Avocados Plus*, 370 F.3d at 1247; *see also Weinberger v. Salfi*, 422 U.S. 749, 766, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) (stating that an exhaustion requirement not bearing on a court's subject-matter jurisdiction is "simply a codification of the judicially developed doctrine of exhaustion"). It prevents "premature interference with agency processes, so that the agency may function efficiently and so that it may have an

opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review." *Salfi*, 422 U.S. at 765, 95 S.Ct. 2457.

 Sometimes, non-jurisdictional exhaustion will not meet these ends. *Avocados Plus*, 370 F.3d at 1247. In those situations, a district court may exercise its discretion and excuse a party's failure to exhaust a non-jurisdictional requirement "if the litigant's interests in immediate judicial review outweigh the government's interests in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further." *McCarthy v. Madigan*, 503 U.S. 140, 146, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992); *see also McKart v. United States*, 395 U.S. 185, 193, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969) (stating exhaustion is "subject to numerous exceptions" (footnote omitted)). Non-jurisdictional exhaustion is also susceptible to waiver and forfeiture. *McQueen*, 488 F.3d at 873. "If exhaustion is not jurisdictional, the court must dismiss only if the issue has been properly presented for decision." *Id.*

Despite the differences between jurisdictional and non-jurisdictional exhaustion requirements, courts have historically referred to exhaustion as being jurisdictional. *Id.* But recent Supreme Court decisions "cast[ ] doubt on that characterization." *Id.* (citing *Jones v. Bock*, 549 U.S. 199, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007)). Indeed, most exhaustion requirements do not affect a court's subject-matter jurisdiction. *Maronyan v. Toyota Motor Sales, U.S.A.*, 658 F.3d 1038, 1040 (9th Cir. 2011) (citing *I.A.M. Nat'l Pension Fund Benefit Plan C. v. Stockton TRI Indus.*, 727 F.2d 1204, 1208 (D.C. Cir. 1984)). And the "usual practice ... is to regard exhaustion as an affirmative defense." *Jones*, 549 U.S. at 212, 127 S.Ct. 910.

 To provide clarity on this and similar issues, the Supreme Court "adopted a readily administrable bright line [rule] for determining whether to classify a statutory limitation as jurisdictional." *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 133 S.Ct. 817, 824, 184 L.Ed.2d 627 (2013) (internal quotation marks omitted). Under the rule, an exhaustion requirement is jurisdictional only if Congress "clearly states" the limitation "shall count as jurisdictional," *Arbaugh*, 546 U.S. at 515, 126 S.Ct. 1235, using "sweeping and direct" language indicating there is no federal jurisdiction before exhaustion, *Salfi*, 422 U.S. at 757, 95 S.Ct. 2457. *See also Reed Elsevier*, 559 U.S. at 166, 130 S.Ct. 1237 (recognizing that *Arbaugh*'s clear-statement rule applies to exhaustion requirements); *Maronyan*, 658 F.3d at 1040 (stating that a party's "failure to exhaust an administrative or other pre-filing remedy deprives federal courts of subject matter jurisdiction only in those cases in which Congress makes plain the jurisdictional character of the exhaustion requirement in question"). Congress need not use magic words. *Sebelius*, 133 S.Ct. at 824. But absent a clear statement, "courts should treat the restriction as nonjurisdictional in character." *Arbaugh*, 546 U.S. at 516, 126 S.Ct. 1235. This analysis focuses on the statutory "condition's text, context, and relevant historical treatment." *Reed Elsevier*, 559 U.S. at 166, 130 S.Ct. 1237.

In *Salfi*, for example, the Court held that the Social Security Act's exhaustion provision is jurisdictional. 422 U.S. at 756–60, 95 S.Ct. 2457. The provision provides:

The findings and decision of the Commissioner of Social Security after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Commissioner of Social Security shall be reviewed by any person, tribunal, or

governmental agency except as herein provided. No action against the United States, the Commissioner of Social Security, or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter.

42 U.S.C. § 405(h); *see Salfi,* 422 U.S. at 756–57 & n.4, 95 S.Ct. 2457. The Court explained that the provision's last sentence is "sweeping and direct and . . . states that no action shall be brought under [§ ] 1331, not merely that only those actions shall be brought in which administrative remedies have been exhausted." *Salfi,* 422 U.S. at 757, 95 S.Ct. 2457. The Court also reasoned that construing the last sentence as simply codifying the judicially-created administrative exhaustion requirement would render that sentence superfluous, because the provision's first two sentences already "assure that administrative exhaustion will be required." *Id.*

In *Arbaugh,* however, the Court held that Title VII's fifteen-or-more-employees requirement is not jurisdictional: the requirement "appears in a separate provision [from Title VII's jurisdictional provision] that does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts." 546 U.S. at 515, 126 S.Ct. 1235 (internal quotation marks omitted).

And in *Kentucky v. United States ex rel. Hagel,* 759 F.3d 588, 597–99 (6th Cir. 2014), the Sixth Circuit held that the RSA's mandatory arbitration requirement, which is at issue here, is not jurisdictional. There, the Army solicited a DFA services contract as a set aside for Small Business Administration Historically Underutilized Business Zones. *Id.* at 591. The SLA claimed the RSA applied to the solicitation and filed for arbitration under the Act. *Id.* The SLA also sought a preliminary injunction in federal court to enjoin the Army

from awarding the contract pending arbitration. *Id.* The district court dismissed the case, ruling that the SLA's failure to exhaust its administrative remedies deprived the court of jurisdiction. *Id.* at 594.

The Sixth Circuit reversed, concluding that the SLA's failure to seek and complete arbitration did not deprive the district court of jurisdiction. *Id.* at 592. The court found that exhaustion under the RSA is not jurisdictional and that the SLA demonstrated it met an exception to that non-jurisdictional requirement. *Id.* at 597. On the first point, the court relied on *Arbaugh's* clear-statement rule and held that RSA § 107d-1(b) is "not phrased in jurisdictional terms," nor does it "reference the jurisdiction of federal courts." *Hagel,* 759 F.3d at 598. The court then rejected the argument that the arbitration requirement must be jurisdictional because it is a mandatory remedy, noting that courts "can craft prudential exceptions to nonjurisdictional exhaustion requirements and grant relief in extraordinary cases." *Id.*

 An independent examination of § 107d-1(b) confirms the holding in *Hagel.* The full text of § 107d-1(b), titled "Grievances of Blind Licensees," provides:

Whenever any State licensing agency determines that any department, agency, or instrumentality of the United States that has control of the maintenance, operation, and protection of Federal property is failing to comply with the provisions of this chapter or any regulations issued thereunder (including a limitation on the placement or operation of a vending facility as described in section 107(b) of the title and the Secretary's determination thereon) such licensing agency may file a complaint with the Secretary who shall convene a panel to arbitrate this dispute pursuant to section 107d-2 of this title, and the decision

of such panel shall be final and binding on the parties except as otherwise provided in this chapter.

20 U.S.C. § 107d-1(b).

Section 107d-1(b) does not contain the sweeping and direct language necessary to demonstrate a clear statement from Congress that failure to arbitrate strips federal courts of jurisdiction. The provision does not "reference the jurisdiction of federal courts." *Hagel*, 759 F.3d at 598. Nor does it "even imply, much less expressly state, that courts lack jurisdiction" to hear an SLA's challenge to a federal agency's conduct. *Avocados Plus*, 370 F.3d at 1248 (citation omitted). The arbitration provision is also separate from the RSA's provision providing for judicial review of an arbitration panel's decision as a final agency action. *See* 20 U.S.C. § 107d-2(a) (providing that the arbitration panel's decision "shall be subject to appeal and review as a final agency action" under the APA). And it "merely creates an administrative procedure for," *Avocados Plus*, 370 F.3d at 1248, an SLA to challenge a federal agency's conduct whenever the SLA determines the agency "is failing to comply with" the RSA, 20 U.S.C. § 107d-1(b). Like the first two sentences of the Social Security Act's exhaustion provision, the RSA's arbitration provision does no more than assure that administrative, non-jurisdictional exhaustion will be required. *See Salfi*, 422 U.S. at 757, 95 S.Ct. 2457. The plain language of the RSA's arbitration provision does not clearly state it is jurisdictional.

To be sure, the Federal Circuit examined the legislative history and purpose of the RSA's arbitration provisions before concluding that the lower court "lacked jurisdiction" because the SLA "did not exhaust [the] *mandatory* administrative remedy" of arbitration. *Kentucky, Educ. Cabinet, Dep't for the Blind v. United States*, 424 F.3d 1222, 1229 (Fed. Cir. 2005) (emphasis added); *see also id.* at 1227 ("Congress intended that arbitration would be the means by which aggrieved vendors and State agencies may obtain a final and satisfactory resolution of disputes." (internal quotation marks omitted)); *id.* at 1228 (observing that the RSA's arbitration provisions demonstrate that Congress established a "comprehensive" and "exclusive" "scheme for the administration of disputes arising from violations of the RSA"). But exhaustion can be mandatory yet not bear on a federal court's subject-matter jurisdiction. *See Reed Elsevier*, 559 U.S. at 166, 130 S.Ct. 1237 ("A statutory condition that requires a party to take some action before filing a lawsuit is not automatically a *jurisdictional* prerequisite to suit." (internal quotation marks omitted)). Like other pre-litigation requirements, a mandatory rule "should not be given the jurisdictional brand" unless "there is [a] 'clear' indication that Congress wanted the rule to be 'jurisdictional.'" *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435–36, 131 S.Ct. 1197, 179 L.Ed.2d 159 (2011). Such an indication—much less a clear one—is absent here.

What is more, *Kentucky, Education* predates *Arbaugh*, in which the Supreme Court provided the clear-statement rule and instructed courts to give "no precedential effect" to "drive-by jurisdictional rulings" that failed to adequately evaluate whether a statutory limitation deprived courts of subject-matter jurisdiction. 546 U.S. at 511, 126 S.Ct. 1235. While *Kentucky, Education* may not be a "drive-by jurisdictional ruling," the Federal Circuit was not asked to determine whether arbitration is a jurisdictional prerequisite to bringing suit in federal court; it was only asked to determine whether § 107d-1(b)'s use of the word "may" meant arbitration was optional. 424 F.3d at 1227. The Feder-

al Circuit held that arbitration is a "mandatory *administrative* remedy" in the event an SLA decides to enforce the RSA. *Id.* at 1229 (emphasis added). But it did not hold that arbitration is a mandatory *jurisdictional* prerequisite to bringing suit.

Intervenors cite two cases they contend support the proposition that we have found comparable statutory language to constitute a jurisdictional bar to suit. First, Intervenors cite *Porta v. U.S. Office of Personnel Management*, 580 Fed.Appx. 636, 639–40 (10th Cir. 2014), in which we held in an unpublished opinion that the Federal Employees Health Benefits Act's exhaustion requirement is jurisdictional. But the panel in that case did not cite or apply *Arbaugh*'s clear-statement rule. It instead cited our prior decision in *Bryan v. U.S. Office of Personnel Management*, 165 F.3d 1315, 1318–19 (10th Cir. 1999), which predates *Arbaugh*. And it is doubtful that we would reach the same conclusion today under the current standard. Second, Intervenors cite *Rigby v. Rasmussen*, 275 F.2d 861, 865 (10th Cir. 1960), in which we affirmed the district court's conclusion that it had no jurisdiction because appellants there failed to exhaust their administrative remedies when they did not apply for administrative review within the statutory timeframe. But *Rigby* also predates *Arbaugh*. And nothing suggests we would find today that the provision at issue clearly stated that the time limit shall count as jurisdictional. *See Arbaugh*, 546 U.S. at 510, 126 S.Ct. 1235 (stating the Court had to clarify that time prescriptions "are not properly typed 'jurisdictional' ").

Concluding that the RSA's arbitration requirement is not jurisdictional does not end the analysis. "[A] failure to exhaust administrative remedies is [often] fatal to a suit in federal court." *Hagel*, 759 F.3d at 599. But "judicially created exhaustion re-quirements are 'subject to numerous exceptions.' " *Forest Guardians v. U.S. Forest Serv.*, 641 F.3d 423, 432 (10th Cir. 2011) (quoting *McKart*, 395 U.S. at 193, 89 S.Ct. 1657).

■■■ As stated, exhaustion may be excused at the district court's discretion "if the litigant's interests in immediate judicial review outweigh the government's interests in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further." *McCarthy*, 503 U.S. at 146, 112 S.Ct. 1081. This test focuses on "the nature of the claim presented and the characteristics of the particular administrative procedure provided." *Id.* We permit district courts to excuse a failure to exhaust where "(1) the plaintiff asserts a colorable constitutional claim that is collateral to the substantive issues of the administrative proceedings, (2) exhaustion would result in irreparable harm, and (3) exhaustion would be futile." *Harline v. Drug Enf't Admin.*, 148 F.3d 1199, 1203 (10th Cir. 1998). We are here concerned with only the irreparable harm exception.

■■■ Courts apply the same irreparable harm standard in the failure-to-exhaust context as in the preliminary injunction context. *See, e.g., Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 110 (D.C. Cir. 1986). For an injury to be irreparable it "must be both certain and great," not "merely serious or substantial." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1262 (10th Cir. 2004). A plaintiff shows it will suffer irreparable harm if it demonstrates there is "a significant risk that [it] will experience harm that cannot be compensated after the fact by monetary damages." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009); *see also Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (recognizing that irreparable harm is harm

that cannot "be adequately atoned for in money ... following a final determination on the merits"). For instance, a party suing the government suffers irreparable harm where "monetary relief might not be available ... because of the [government's] sovereign immunity." *Prairie Band of Potawatomi Indians*, 253 F.3d at 1251.

The Sixth Circuit's *Hagel* decision is again instructive. Recall that the SLA in that case sought a preliminary injunction to enjoin the Army from awarding a DFA services contract pending arbitration under the RSA. 759 F.3d at 591. The court held that although the RSA's arbitration provision is not jurisdictional, it still "has bite." *Id.* at 599. Even so, the court excused the SLA's failure to exhaust because "requiring the completion of arbitration prior to filing in federal court for a preliminary injunction would likely result in irreparable harm." *Id.* Because sovereign immunity bars an arbitration panel or a federal court from awarding the SLA money damages if the Army was found to have violated the RSA, requiring exhaustion would "result in a loss for which there is no remedy, an irreparable harm." *Id.* at 599–600.

 Similarly, requiring Kansas to complete arbitration before coming to federal court for a preliminary injunction would have resulted in irreparable harm. Under Kansas's interpretation of the RSA

and its accompanying regulations, the Army must negotiate with Kansas for the DFA services contract at Fort Riley, or at least give Kansas priority in the bidding process. *See* 34 C.F.R. 395.33(a)–(d). But the Army has determined the RSA does not apply to the DFA services contract. In the absence of an injunction pending arbitration, the Army would have been able to proceed under the JWOD and award the DFA services contract to Lakeview. This means Kansas would not have been able to compete for the contract, even though Kansas's prior bids were competitive and the Army awarded the contracts to Kansas. As a result, there was a significant risk that Kansas would have suffered great financial harm by the time it eventually prevailed in arbitration. Although economic harm is generally not irreparable, sovereign immunity bars an arbitration panel or a federal court from awarding Kansas monetary damages even though the arbitration panel found that the Army violated the RSA. *See Hagel*, 759 F.3d at 599; *see also Prairie Band of Potawatomi Indians*, 253 F.3d at 1251.[6] Thus, requiring Kansas to complete arbitration before challenging the Army's decision not to apply the RSA to the DFA services contract would have resulted in a loss for which there is no remedy—an irreparable harm. The district court did not abuse its discretion in concluding the same. *See Kansas v. United*

---

**6.** At least one court has held that an SLA will not suffer irreparable harm in similar circumstances because the Secretary of the DOE has "broad remedial powers" to remedy any harm an SLA may suffer absent an injunction. *See, e.g., Colorado v. United States*, 813 F.Supp.2d 1230, 1236 (D. Colo. 2011) (quoting *Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 109 (D.C. Cir. 1986)). This is incorrect. The Secretary does not have broad remedial powers—the head of the accused federal agency does. Section 107d-2(b) of the RSA provides:

If the [arbitration] panel appointed pursuant to [an SLA's complaint with the Secretary] finds that the acts or practices of any such department, agency, or instrumentality are in violation of this chapter, or any regulation issued thereunder, the *head of any such department, agency, or instrumentality* shall cause such acts or practices to be terminated promptly and shall take such other action as may be necessary to carry out the decision of the panel.

20 U.S.C. § 107d-2(b) (emphasis added); *see also* 34 C.F.R. § 395.37(d).

*States*, 171 F.Supp.3d 1145, 1155–56 (D. Kan. 2016).

Intervenors argue that "Kansas [could not] secure a premature adjudication of its RSA claim in district court, when the [DOE] ha[d] not yet had the chance to weigh in on Kansas's claims." Certainly, one of exhaustion's primary purposes is to prevent "premature interruption of the administrative process." *McKart*, 395 U.S. at 193, 89 S.Ct. 1657. But contrary to Intervenors' belief, Kansas did not seek adjudication of its substantive claim against the Army. It only sought to preserve the status quo through an injunction so an arbitration panel could determine in the first instance whether the Army violated the RSA. Kansas's request for a preliminary injunction did not interrupt the administrative process—it actually sought to preserve that process so it could run its course before the Army awarded the contract to Lakeview.

We conclude that the RSA's arbitration provisions are not jurisdictional, and that Kansas satisfies the irreparable harm exception to jurisprudential exhaustion. The district court had jurisdiction to issue the preliminary injunction under § 1331 and the RSA, and under the APA's limited waiver of sovereign immunity.

## III. CONCLUSION

The jurisdictional issue raised by this appeal falls within an exception to the mootness doctrine for matters capable of repetition but evading review. Considering the issue on the merits, we AFFIRM the district court's ruling that it had jurisdiction to issue the preliminary injunction prohibiting the Army from proceeding with the JWOD contract pending arbitration. But because the arbitration panel has since issued its decision thereby dissolving that injunction, we decline to address whether the district court correctly granted the injunction.

BACHARACH, J., dissenting.

Before considering the merits, we must decide whether this appeal has become moot. Early in the litigation, the parties knew that the merits would be decided in arbitration, but the plaintiff (the Kansas Department for Children and Families) wanted interim relief prior to the arbitration decision. So, the plaintiff sued in federal court for a preliminary injunction pending the arbitration decision. The district court granted the preliminary injunction, and two defendants (SourceAmerica and Lakeview)[1] appealed. During the pendency of the appeal, the arbitration panel decided in favor of the plaintiff. The threshold question is whether the appeal of the preliminary injunction has become moot.

SourceAmerica and Lakeview answer "no," arguing that the appeal is not moot because the dispute is capable of repetition yet evading review. But the dispute would be capable of repetition only if SourceAmerica or Lakeview had shown a reasonable expectation that the plaintiff would again face the alleged illegality. SourceAmerica and Lakeview have failed to make this showing. Thus, I conclude that the appeal is moot.

## I. The Dispute Between the Army and a Kansas Agency

The underlying dispute involves the procurement of dining services for a military base in Kansas (Fort Riley). In 2011, the Army entered into a contract for dining services with the plaintiff, a Kansas agency. This contract expired in February 2016.

---

1. These defendants had intervened in district court.

As the expiration date neared, the Army considered changing its dining services contractor. The choice between contractors triggered a legal question.

The legal question arose because two statutes potentially applied: the Randolph-Sheppard Act (20 U.S.C. §§ 107-107f) and the Javits-Wagner-O'Day Act (41 U.S.C. §§ 8501-8506). If the Army concluded that the Randolph-Sheppard Act controlled, the Army would presumably enter into another contract with the Kansas agency. Instead the Army concluded that the Javits-Wagner-O'Day Act controlled. Based on this conclusion, the Army decided to hire Lakeview to provide dining services.[2]

But before the Army entered into a contract with Lakeview, the Kansas agency stepped in. The Kansas agency believed that the Randolph-Sheppard Act controlled. So, the Kansas agency demanded arbitration, as permitted under the Randolph-Sheppard Act. In connection with this arbitration, the Kansas agency obtained a preliminary injunction that effectively prohibited the Army from awarding the contract to Lakeview prior to the arbitration panel's decision. Lakeview and SourceAmerica[3] appealed the grant of the preliminary injunction.

During the pendency of the appeal, the arbitration panel decided in favor of the Kansas agency. With this arbitration decision, the preliminary injunction expired. We must now decide whether the appeal has become moot.

## II. Mootness Doctrine and the Exception for Disputes Capable of Repetition Yet Evading Review

When an appeal becomes moot, it must be dismissed. *See Campbell-Ewald Co. v.*

*Gomez,* 577 U.S. ——, 136 S.Ct. 663, 669, 193 L.Ed.2d 571 (2016). Ordinarily, an appeal becomes moot when intervening circumstances strip the plaintiff of a personal stake in the outcome. *See id.* But an exception exists for disputes that are capable of repetition yet evade review. *See Weinstein v. Bradford,* 423 U.S. 147, 148-49, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975) (per curiam). This exception contains two elements: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again." *Id.* at 149, 96 S.Ct. 347. The issue here turns on the second element: whether a reasonable expectation exists for the complaining party to again face the alleged illegality.

But when a defendant appeals a preliminary injunction, who is the "complaining party"? Is it the plaintiff or is it the defendant being enjoined? We have answered that the "complaining party" is the plaintiff, not the defendant being enjoined. *Fischbach v. N.M. Activities Ass'n,* 38 F.3d 1159, 1161 (10th Cir. 1994). Here the plaintiff is the Kansas agency. As a result, I consider whether a reasonable expectation exists for the Kansas agency to again face the alleged illegality. *See id.*

## III. Allocation of the Burdens

The Kansas agency bears the burden to show that the appeal is moot. *See Paige v. Jubber,* 584 F.3d 1327, 1336 (10th Cir. 2009). But SourceAmerica and Lakeview bear the burden to show that the dispute is capable of repetition yet evading review. *See Wyoming v. U.S. Dep't of Interior,* 674

---

**2.** Lakeview is a nonprofit entity that provides employment opportunities to individuals with significant disabilities.

**3.** SourceAmerica is a nonprofit entity that supports Lakeview and similarly situated nonprofit entities.

F.3d 1220, 1229 (10th Cir. 2012); *Jordan v. Sosa*, 654 F.3d 1012, 1035 (10th Cir. 2011).

## IV. Application of the Burdens

The Kansas agency has shown that the appeal is moot because the preliminary injunction expired once the arbitration panel rendered a decision. Once the decision was rendered, the Kansas agency lost any stake in the outcome of the appeal.

SourceAmerica and Lakeview question whether the Kansas agency retained a stake in the outcome, arguing that the agency took inconsistent positions in district court and on appeal. According to SourceAmerica and Lakeview, the Kansas agency asked the district court to leave the preliminary injunction " 'in place while this case [was] pending on appeal.' " Defs.' Supp. Resp. Br. at 3 (emphasis omitted) (quoting State of Kansas's Response Memorandum at 1, *Kansas v. United States*, No. 15-CV-4907-DDC-KGS (ECF No. 84)). In the view of SourceAmerica and Lakeview, the Kansas agency has taken a different position on appeal by denying an ongoing interest in the preliminary injunction.

This argument is incorrect and immaterial. It is incorrect because the Kansas agency never argued for continuation of the preliminary injunction after the arbitration decision. In district court, the Kansas agency explained that it was "adopt[ing] the position and the reasoning of the [Army]." State of Kansas's Response Memorandum at 1, *Kansas v. United States*, No. 15-CV-4907-DDC-KGS (ECF No. 84). The Army's position was that the preliminary injunction should remain in place on appeal "*to the extent it ha[d] not already dissolved on its own terms.*" United States' Response at 5, *Kansas v. United States*, No. 15-CV-4907-

DDC-KGS (ECF No. 81) (emphasis added). Thus, the Kansas agency never reversed its position. But even if the Kansas agency had done so, the reversal would have been immaterial because the district court did not resurrect and extend the injunction.[4]

SourceAmerica and Lakeview also argue that the dispute is capable of repetition yet evading review. But SourceAmerica and Lakeview have failed to show a reasonable expectation for the Kansas agency to again face the alleged illegality.

SourceAmerica and Lakeview seem to make four arguments:

1. Similar disputes will arise involving SourceAmerica or other entities.

2. District courts will issue preliminary injunctions in similar cases.

3. This appeal provides us with our only chance to review the district court's actions and reasoning.

4. The Kansas agency will again face the alleged illegality because the Army might disobey the arbitration decision.

These arguments are unpersuasive.

The first argument is that SourceAmerica and others are often involved in similar disputes. But this argument is irrelevant. Under our precedent, we ask whether a reasonable expectation exists for the plaintiff (the Kansas agency) to again face the alleged illegality. *See* Part II, above. We do not ask whether the defendants or other entities might become involved in similar disputes.

The second argument is that district courts will issue preliminary injunctions in similar cases. But again, the pertinent question is whether the Kansas agency will

---

4. We need not address whether the district court would have had jurisdiction to resurrect and extend the injunction while this appeal was pending.

face the same alleged illegality in the future. That question is unaffected by the issuance of other preliminary injunctions in similar cases not involving the Kansas agency.

The third argument is that this appeal is the sole chance for us to review the district court's actions and reasoning. For this argument, SourceAmerica and Lakeview point out that the Kansas agency had sought only a preliminary injunction, not a permanent injunction. The absence of a request for a permanent injunction could arguably preclude further review, but would not subject the Kansas agency to recurrence of the dispute.

Finally, SourceAmerica and Lakeview insist that the Kansas agency should reasonably expect to confront the same dispute again. But in their supplemental brief on mootness, SourceAmerica and Lakeview do not explain the reason for such an expectation.[5]

At oral argument, SourceAmerica and Lakeview suggested that the dispute is capable of repetition because the Army might disobey the arbitration decision. This suggestion was based on two arguments. Both are unconvincing.

The first argument is that the Army asked the arbitration panel to vacate its decision. This argument is unsupported and illogical. The argument is unsupported because the appellate record does not include a motion to vacate the arbitration decision.[6] The argument is also illogical because moving to vacate a decision does not suggest that the movant will disobey the decision.

The second argument is that the panel member chosen by the Army wrote a dissenting opinion. In this dissent, the panel member concluded that the arbitration proceedings lacked fundamental fairness. But this conclusion is immaterial: The disagreement of a panel member selected by the Army does not suggest that the Army would refuse to obey the arbitration panel's ultimate decision.

Based on the arguments presented by SourceAmerica and Lakeview, we have no reason to expect the Army to disobey the arbitration decision. And more generally, SourceAmerica and Lakeview have not shown a reasonable expectation that the Kansas agency will again be subject to the alleged illegality. Accordingly, the appeal is moot.

5. At one point in their supplemental brief, SourceAmerica and Lakeview argue:

Moreover, Kansas's position all but guarantees that these issues will not only be litigated in some future case, they will be litigated again *in this case*. Kansas's position is that since it won in arbitration, SourceAmerica and Lakeview "will be unable to bid for the contract," and that if Kansas should "need[ ] to" enforce the award, it would file for mandamus in "a new proceeding." Kansas's view is that the arbitration precludes SourceAmerica and Lakeview from receiving the Fort Riley contract, notwithstanding the fact that the arbitration panel refused to allow SourceAmerica and Lakeview the opportunity to even be heard in that forum. Appellants' Supp. Br. at 8-9 (alteration & emphasis in original) (citations omitted). This argument is difficult to understand; it consists

solely of an assertion followed by two sentences allegedly stating a view and a "position" held by the Kansas agency. It is unclear what is meant by the assertion that "these issues ... will be litigated again *in this case*." *Id.* (emphasis in original). I do not see how any issues could be litigated again in this case, for this case will soon be over. In any event, this argument does not explain why the Kansas agency will again be subjected to the alleged illegality.

6. SourceAmerica and Lakeview might be confusing a motion for a new proceeding with a motion to vacate. Between the arbitration hearing and the decision, the Army moved for a new proceeding. Oral argument was the first time that anyone mentioned an effort by the Army to vacate the arbitration decision.

The majority disagrees, reasoning that the dispute will likely recur when the current contract expires because the Kansas agency and the Army will again confront the same dispute. But SourceAmerica and Lakeview never made this argument.

This argument *was* presented in *Kentucky v. United States ex rel. Hagel*, 759 F.3d 588 (6th Cir. 2014). In *Kentucky*, a Kentucky agency invoked the Randolph-Sheppard Act, forcing the Army into arbitration. *Kentucky*, 759 F.3d at 593. The Kentucky agency also sued the Army in district court, seeking a preliminary injunction that would enjoin the Army from awarding a contract before the parties completed the arbitration. *Id.* The district court refused to grant the preliminary injunction, and the Kentucky agency appealed. *Id.* at 594.

During the pendency of the appeal, the Army awarded the contract to another contractor, but the arbitration panel then issued a decision in favor of the Kentucky agency. *Id.* at 594-95. Though these developments would ordinarily moot the appeal, the state agency expressly argued that the same dispute would "keep occurring every time there is a solicitation for dining facility attendant services." *Kentucky v. United States*, No. 12-6610, Appellant's Letter Br. at 5 (6th Cir. Apr. 7, 2014). Based on this argument, the Sixth Circuit Court of Appeals decided that the dispute was capable of repetition yet evading review. *Kentucky*, 759 F.3d at 595-97. The court explained:

> [T]he history of these parties demonstrates that this scenario will likely play out again between them in the future. At roughly five-year intervals, the Army solicits bids for dining-facility-attendant services. On at least two prior occasions, [the Kentucky agency] has challenged the Army's decision that a solicitation is not governed by the [Randolph-Sheppard] Act. It does not appear likely that

the Army will stop needing dining-facility-attendant services, nor does it appear likely that [the Kentucky agency] will stop asserting that the [Randolph-Sheppard] Act applies to these contracts.

*Id.* at 597 (citations omitted). As this explanation reflects, the Sixth Circuit was persuaded by a case-specific argument that the dispute would likely recur: The Army would continue to need dining services when the current contracts expired, and the state agency would continue to assert that the Randolph-Sheppard Act applied.

If SourceAmerica and Lakeview had made a similar argument, I would ultimately have agreed with the majority. But SourceAmerica and Lakeview didn't.

The majority points out that SourceAmerica and Lakeview contended that *Kentucky*'s reasoning applies here. Op. at 1239. But, as the majority points out, SourceAmerica and Lakeview asserted that *Kentucky* applied only on the ground that they could expect a motion to stay the award of a contract pending arbitration involving these parties. Op. at 1239 (quoting Appellants' Supp. Br. at 7). But SourceAmerica and Lakeview never say *why* they should expect the Kansas agency to move for a stay.

SourceAmerica and Lakeview could instead have argued, as the majority does here, that the Kansas agency would face the same issue because of the need to hire a new contractor when the current contract expires. But SourceAmerica and Lakeview never made this argument, and the majority does not point to anything that could be interpreted as such an argument.

The majority also points out that SourceAmerica and Lakeview cited *Kingdomware Technologies, Inc. v. United States*, — U.S. ——, 136 S.Ct. 1969, 195 L.Ed.2d 334 (2016). Op. at 1239. These citations to

*Kingdomware* prove little. SourceAmerica and Lakeview cited *Kingdomware* only for the applicable test on mootness and this test's first element. Appellants' Supp. Br. at 5. These matters are not involved here.[7]

We are called upon to consider only the arguments presented by the parties—not the arguments that the parties could have raised. *See Modoc Lassen Indian Hous. Auth. v. HUD*, 864 F.3d 1212, 1224 n.8 (10th Cir. 2017) (declining to consider an argument because it had not been presented by the parties). Absent other, persuasive arguments from SourceAmerica and Lakeview, I regard the appeal as moot.[8] Because the majority disagrees, I respectfully dissent.

---

7. The majority states that SourceAmerica and Lakeview cited *Kingdomware* and argued that " '[t]he same is true here.' " Op. at 1239. The quotation from SourceAmerica and Lakeview's brief involved only *Kingdomware* 's reference to the first element of the exception: "Similarly, the Supreme Court held last year that an appeal from a government procurement dispute is not rendered moot when the time period in which it arises is too short 'to complete judicial review of the lawfulness of the procurement.' *Kingdomware Techs., Inc. v. United States* [—— U.S. ——] 136 S.Ct. 1969, 1976 [195 L.Ed.2d 334] (2016). The same is true here." Appellants' Supp. Br. at 1. This element is not at issue here.

8. At oral argument, the Kansas agency acknowledged that if the appeal is considered moot, we should vacate the district court's preliminary-injunction order and related rulings. *See Kan. Judicial Rev. v. Stout*, 562 F.3d 1240, 1248-49 (10th Cir. 2009).